# EXHIBIT 1

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 2

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 3

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 4

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 5

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 6

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 7

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 8

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 9

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 10

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 11

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 12

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 13

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 14

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 15

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 16

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 17

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 18

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 19

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 20

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 21

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 22

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 23

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 24

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 25

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 26

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 27

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 28

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 29

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 30

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 31

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 32

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 33

1  CONSTANCE NORTON, CA Bar No. 146365
   cnorton@littler.com
2  JOHN S. HONG, CA Bar No. 255150
   jhong@littler.com
3  LITTLER MENDELSON
   A Professional Corporation
4  650 California Street, 20th Floor
   San Francisco, CA 94108.2693
5  Telephone:   415.433.1940
   Fax No.:      415.399.8490
6
   Attorneys for Defendant
7  FIRST TRANSIT, INC.

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

11

| | |
|---|---|
| ADRIENNE HUDSON, individually and on behalf of all others similarly situated, | Case No. C10-03158 WHA |
| Plaintiff, | **DEFENDANT'S AMENDED RESPONSES TO PLAINTIFF'S SECOND SET OF INTERROGATORIES** |
| v. | |
| FIRST TRANSIT, INC., | |
| Defendant. | |

12

13

14

15

16

17

18  **PROPOUNDING PARTY: Plaintiff ADRIENNE HUDSON**

19  **RESPONDING PARTY:   Defendant FIRST TRANSIT, INC.**

20  **SET NUMBER:         TWO (Amended)**

21           Defendant FIRST TRANSIT, INC. (hereinafter "Defendant") under oath, makes the

22  following amended answers and objections to the written interrogatories propounded to it by

23  Plaintiff on January 24, 2011. The amended answers and objections are made solely for the purpose

24  of this action.  Each answer is subject to all objections as to competence, relevance, materiality,

25  propriety, and admissibility, and any and all other objections and grounds that would require the

26  exclusion of any statement if any interrogatories were asked of, or any statements contained herein

27

28

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108 2693
415 433.1940

1.                                    CASE NO. C10-03158 WHA

DEF'S AMENDED RESPONSES TO PLTF'S INTERROGATORIES (SET 2)

1    were made by, a witness present and testifying in court, all of which objections and grounds are

2    reserved and may be interposed at the time of trial.

3                To the extent that any or all of the interrogatories call for information which

4    constitutes information or material prepared in anticipation of litigation or for trial or for information

5    covered by the work product doctrine or which constitutes information which is privileged by virtue

6    of the attorney-client privilege, Defendant objects to each and every such interrogatory and thus will

7    not supply or render any information or material protected from discovery by virtue of the work

8    product doctrine, or the attorney-client privilege.

9                The above-stated objections are hereby made applicable to each and all of these

10   interrogatories and are hereby, as to each and all of them, incorporated by reference as if fully set

11   forth therein.

## AMENDED RESPONSES TO INTERROGATORIES

12

### INTERROGATORY NO. 10:

13

14               Identify or describe each of the records or other information YOU maintain,

15   consistent with the requirements of 29 C.F.R. § 1607.4, that would disclose the impact of YOUR use

16   of criminal background checks in the selection of applicants for COVERED POSITIONS has upon

17   employment opportunities of persons by identifiable race or ethnic group.

### RESPONSE TO INTERROGATORY NO. 10:

18

19               First Transit objects to defined term "YOU/R" on the ground that it is overly broad.

20   First Transit objects to the defined Term "COVERED POSITIONS" on the grounds that it is

21   compound, vague, ambiguous and unintelligible.    First Transit objects to the defined term

22   "CRIMINAL BACKGROUND CHECKS" on the grounds that it is overly broad, compound, and

23   lacks foundation. First Transit further objects to this Interrogatory on the ground that it calls for a

24   legal conclusion. First Transit further objects to this Interrogatory on the grounds that it is

25   compound, vague and ambiguous.

26               Subject to and without waving the foregoing objections, First Transit responds that

27   the guidelines set forth in 29 C.F.R. § 1607.1, et seq. "do not require a user to conduct validity

28   studies of selection of procedures where no adverse impact results." First Transit maintains that its

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108 2693
415 433 1940

2.

CASE NO. C10-03158 WHA

DEF'S AMENDED RESPONSES TO PLTF'S INTERROGATORIES (SET 2)

1   criminal background check policies do not have an adverse impact on any members of a protected

2   class, and as such, it is not required to maintain the records specifically described in 29 C.F.R.

3   § 1607.4.

4            For data collection relevant to EEO-1 report compliance obligations, First Transit

5   currently provides its field locations with a Voluntary Disclosure Forms (HRF-033, revised Nov.

6   2010). It is envisioned that it will be filled out by a job applicant, and maintained in a separate file

7   in each field location to which the individual applied. Previously, data relevant to EEO-1 report

8   compliance obligations was collected by First Transit field locations using various forms, including

9   the Part 1 – Investigative Consumer Report Disclosure and Release (rev. October 2008) and

10  Voluntary EEO Applicant Questionnaires (rev. 10/08), all of which are and were separately

11  maintained in the field locations. First Transit field locations also collect and log applicant flow

12  data, including EEO data, on forms developed and/or maintained by the individual field locations.

13  Once an individual is made a contingent offer of employment, his or her race and national origin

14  data, amongst other things, is input by the field location into the ADP payroll system. The data

15  collected in that system is used to generate First Transit's EEO-1 filings.

16  **AMENDED RESPONSE TO INTERROGATORY NO. 10:**

17           First Transit objects to defined term "YOU/R" on the ground that it is overly broad.

18  First Transit objects to the defined Term "COVERED POSITIONS" on the grounds that it is

19  compound, vague, ambiguous and unintelligible. First Transit objects to the defined term

20  "CRIMINAL BACKGROUND CHECKS" on the grounds that it is overly broad, compound, and

21  lacks foundation. First Transit further objects to this Interrogatory on the ground that it calls for a

22  legal conclusion. First Transit further objects to this Interrogatory on the grounds that it is

23  compound, vague and ambiguous.

24           Subject to and without waving the foregoing objections, First Transit responds that

25  the guidelines set forth in 29 C.F.R. § 1607.1, *et seq.* "do not require a user to conduct validity

26  studies of selection of procedures where no adverse impact results." First Transit maintains that its

27  criminal background check policies do not have an adverse impact on any members of a protected

28

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA  94108 2693
415 433 1940

CASE NO. C10-03158 WHA

DEF'S AMENDED RESPONSES TO PLTF'S INTERROGATORIES (SET 2)

1    class, and as such, it is not required to maintain the records specifically described in 29 C.F.R.

2    § 1607.4.

3              While applicant flow logs contain data that can be characterized as "EEO data" they

4    are not utilized for that purpose.  To the extent a conditional offeree of employment who begins

5    training elects to disclose his or her race or national origin, that race or national origin data, among

6    other pieces of information, is inputted by the field location into the ADP payroll system.  The data

7    collected in that system is used for First Transit's EEO-1 report compliance obligations.  *See, e.g.,*

8    D0093820-33.  The field locations also use the ADP payroll system to input start dates for these

9    employees, as well as any reason for which the individual's employment is terminated.  However,

10   the field locations have not historically used standard terminology in inputting termination data into

11   the ADP system to describe the reason an individual's employment may have been terminated; thus,

12   it is not always readily apparent from the description utilized whether an individual was terminated

13   due to an adverse finding on his or her criminal background check.

14             Since approximately March 2010, when the Criminal Background Checking Unit

15   ("CBCU") was implemented, the CBCU began tracking *inter alia* whether a conditional offeree of

16   employment failed a criminal background check.  *See* D0210396- D0210688.  Additionally, since

17   2010, First Transit has begun using a revised employment application that tracks the applicant's

18   disposition, including "failed background check."  *See* D0078205.  The application has been so

19   revised in anticipation of an impending applicant tracking system, which has yet to be implemented,

20   and thus the field locations still may not utilize the categories therein provided.

21   **INTERROGATORY NO. 11:**

22             Identify or describe each of the records or other information YOU maintain,

23   consistent with the requirements of 29 C.F.R. § 1607.4, that would disclose the impact of YOUR use

24   of criminal background checks in the termination of incumbent employees in COVERED

25   POSITIONS has upon employment opportunities of persons by identifiable race or ethnic group.

26   **RESPONSE TO INTERROGATORY NO. 11:**

27             First Transit objects to defined term "YOU/R" on the ground that it is overly broad.

28   First Transit objects to the defined Term "COVERED POSITIONS" on the grounds that it is

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108 2693
415 433 1940

4.                          CASE NO. C10-03158 WHA

DEF'S AMENDED RESPONSES TO PLTF'S INTERROGATORIES (SET 2)

1  compound, vague, ambiguous and unintelligible. First Transit further objects to this Interrogatory on

2  the ground that it calls for a legal conclusion. First Transit further objects to this Interrogatory on

3  the grounds that it is compound, vague and ambiguous.

4          Subject to and without waving the foregoing objections, First Transit responds that

5  the guidelines set forth in 29 C.F.R. § 1607.1, *et seq.* "do not require a user to conduct validity

6  studies of selection of procedures where no adverse impact results." First Transit maintains that its

7  criminal background check policies do not have an adverse impact on any members of a protected

8  class, and as such, it is not required to maintain the records specifically described in 29 C.F.R.

9  § 1607.4.

10          First Transit further responds that once an applicant is made a contingent offer of

11  employment, his or her race and national origin data, amongst other things, is to be inputted by the

12  field location into the ADP payroll system. The field locations also use the ADP payroll system to

13  input start and termination dates for contingent employees and employees, as well as any reason that

14  the individual's employment was terminated. The field locations have used no standard terminology

15  in inputting termination data into the ADP system to describe the reason an individual's employment

16  may have been terminated; thus, it is not always readily apparent from the description utilized

17  whether an individual was terminated due to an adverse finding on his or her criminal background

18  check.

19  **AMENDED RESPONSE TO INTERROGATORY NO. 11:**

20          First Transit objects to defined term "YOU/R" on the ground that it is overly broad.

21  First Transit objects to the defined Term "COVERED POSITIONS" on the grounds that it is

22  compound, vague, ambiguous and unintelligible. First Transit further objects to this Interrogatory on

23  the ground that it calls for a legal conclusion. First Transit further objects to this Interrogatory on

24  the grounds that it is compound, vague and ambiguous.

25          Subject to and without waving the foregoing objections, First Transit responds that

26  the guidelines set forth in 29 C.F.R. § 1607.1, *et seq.* "do not require a user to conduct validity

27  studies of selection of procedures where no adverse impact results." First Transit maintains that its

28  criminal background check policies do not have an adverse impact on any members of a protected

**CASE NO. C10-03158 WHA**

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA  94108-2693
415.433.1940

DEF'S AMENDED RESPONSES TO PLTF'S INTERROGATORIES (SET 2)

1    class, and as such, it is not required to maintain the records specifically described in 29 C.F.R.

2    § 1607.4.

3          To the extent an incumbent employee elects to disclose his or her race or national

4    origin at the time of hire, that race or national origin data, among other pieces of information, is

5    inputted by the field location into the ADP payroll system. The data collected in that system is used

6    for First Transit's EEO-1 report compliance obligations. *See, e.g.*, D0093820-33.   The field

7    locations also use the ADP payroll system to input start and termination dates for incumbent

8    employees, as well as any reason for which the individual's employment was terminated.  However,

9    the field locations have used no standard terminology in inputting termination data into the ADP

10   system to describe the reason an individual's employment may have been terminated; thus, it is not

11   always readily apparent from the description utilized whether an individual was terminated due to an

12   adverse finding on his or her criminal background check. Further, since approximately March 2010,

13   the CBCU began tracking *inter alia* whether an incumbent employee failed a criminal background

14   check. *See, e.g.*, D0210396 - D0210688.

15

16   Dated:  June 9, 2011

17

18   _____
     CONSTANCE E. NORTON
19   JOHN S. HONG
     LITTLER MENDELSON, P.C.
20   Attorneys for Defendant
     First Transit, Inc.

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108-2693
415 433 1940

6.                              CASE NO. C10-03158 WHA

DEF'S AMENDED RESPONSES TO PLTF'S INTERROGATORIES (SET 2)

<u>VERIFICATION</u>

I, RUSS A. IDDINGS, declare:

I am Director of Human Resources for FirstGroup America and an agent of Defendant First Transit, Inc., the Defendant in the above-entitled action. I have been authorized to make this verification on its behalf.

I have read the foregoing Defendant's Amended Responses to Plaintiff's Second Set of Interrogatories and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Cincinnati, Ohio on this 9th day of June, 2011.

_____
RUSS IDDINGS

Firmwide:102120785.1 063012.1026

CASE NO. C10-03158 WHA

LITTLER MENDELSON

DEF'S AMENDED RESPONSES TO PLTF'S INTERROGATORIES (SET 2)

1

### PROOF OF SERVICE

2      I am a resident of the State of California, over the age of eighteen years, and not a

3  party to the within action.  My business address is 650 California Street, 20th Floor, San Francisco,

4  California 94108.2693.  On June 9, 2011, I served the within document(s):

5
### DEFENDANT'S AMENDED RESPONSES TO PLAINTIFF'S
6   ### SECOND SET OF INTERROGATORIES

7      ☐      by facsimile transmission at or about _____ on that date. This document
               was transmitted by using a facsimile machine that complies with California Rules
8              of Court Rule 2003(3), telephone number 415.399.8490. The transmission was
               reported as complete and without error. A copy of the transmission report, properly
9              issued by the transmitting machine, is attached. The names and facsimile numbers
               of the person(s) served are as set forth below.
10

11     ☐      by placing a true copy of the document(s) listed above for collection and mailing
               following the firm's ordinary business practice in a sealed envelope with postage
12             thereon fully prepaid for deposit in the United States mail at San Francisco,
               California addressed as set forth below.

13     ☒      by depositing a true copy of the same enclosed in a sealed envelope, with delivery
               fees provided for, in an overnight delivery service pick up box or office designated
14             for overnight delivery, and addressed as set forth below.

15

16     Christopher Wilmes, Esq.                    Teresa Demchak, Esq.
       Hughes Socol Piers Resnick & Dym            Goldstein, Demchak, Baller, Borgen &
17     70 W. Madison Street, Suite 4000            Dardarian
       Chicago, IL  60602                          300 Lakeside Drive, Suite 1000
18                                                  Oakland, CA   94612

19     *Attorneys for Plaintiff*                    *Attorneys for Plaintiff*

20

21     Madeline Neighly, Esq.
       National Employment Law Project
22     405 14th Street, Suite 1400
       Oakland, CA  94612
23

24     *Attorneys for Plaintiff*

25      I am readily familiar with the firm's practice of collection and processing

26  correspondence for mailing and for shipping via overnight delivery service.  Under that practice it

27  would be deposited with the U.S. Postal Service or if an overnight delivery service shipment,

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415 433 1940

1  deposited in an overnight delivery service pick-up box or office on the same day with postage or fees

2  thereon fully prepaid in the ordinary course of business.

3          I declare under penalty of perjury under the laws of the State of California that the

4  above is true and correct.  Executed on June 9, 2011, at San Francisco, California.

5

6                                        _____
                                            ROSIE T. YEE

7  Firmwide:102160371.1 063012.1026

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108 2693
415 433 1940

2.
PROOF OF SERVICE

# EXHIBIT 34

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER

# EXHIBIT 35



Littler Mendelson, P.C.
50 W. San Fernando, 15th Floor
San Jose, CA 95113.2303

Ronald A. Peters
408.795.3433 direct
408.998.4150 main
408.288.5686 fax
rpeters@littler.com

June 7, 2010

**VIA U.S. MAIL**

Julian Melendes
U.S. Equal Employment Opportunity Commission
1301 Clay Street, Suite 1170 N.
Oakland, CA 94612

Re:   *Adrienne Hudson v. First Transit, Inc.*
      *Agency Charge No. 555-2010-00159*

RECEIVED
JUN 0 8 2010
EEOC-OLO

Dear Ms. Melendes:

### I.   Introduction

Ms. Adrienne Hudson ("Claimant") was conditionally hired by First Transit ("The Company") as a bus driver on March 2, 2009. Ms. Hudson filed a Charge of Discrimination on November 10, 2009, against the Equal Employment Opportunity Commission ("The Commission"), in the above referenced charge on or about November 10, 2009. A concurrent filing with the California Department of Fair Employment and Housing was also made, and the DFEH issued a right to sue letter on or about December 17, 2009. This letter will constitute the Company's position statement with respect to this charge.

### II.   The Commission's Request For Information

As set forth more completely below, Claimant's claim of discrimination on the basis of race and sex is utterly without merit. Furthermore, Claimant did not at any time perform in her job, having been terminated for falsification of her employment application prior to starting work. Claimant in fact admits in her charge that the sole basis for her claim of discrimination is her subjective "belief" that the employer discriminates against persons on the basis of their race or sex. In her charge she does not articulate even one fact, other than her own termination, to support her claim of company wide discrimination. Therefore, she could not have any facts or any knowledge to support her claims. As such, attempting to force the company to produce documents and information related to all of its work locations and all of its employees nationwide is without justification and clearly abusive. While the Company wishes to cooperate with the Commission's investigation of this charge, it cannot be expected

HUD 000033

Julian Melendes
June 7, 2010
Page 2

to respond to such an overbroad request based solely upon the admittedly unsubstantiated and speculative claims of a single claimant. The Company is willing to discuss alternatives or limitations on the information being sought to enable the Company to assist the Commission in its investigation of this matter, but would ask that the Commission first consider the validity of Claimant's allegations before proceeding with further discussions about what must be produced.

## III.  Facts

First Transit is a private transportation company that contracts with Veolia Transportation to provide service for the Regional Center of the East Bay, Golden Gate Regional Center, and East Bay Para Transit service. First Transit is located at 407 High Street, Oakland, California, 94601. This location employs approximately 225 employees and operates paratransit bus transportation services to those individuals who have disabilities which will not allow them to utilize public transportation.

The Company's Oakland location is comprised of a diverse workforce consistent with the local demographics, offering opportunities to qualified individuals with regard to any protected status pursuant to any state or federal law or regulation including Title VII of the Civil Rights Act of 1964.

On December 2, 2008, Claimant submitted an application for the position of Bus Driver at the Company's Oakland location. Claimant was advised at the time of the submission of her application and signed a statement indicating her understanding that all employees must successfully complete the Background Check, Department of Transportation ("DOT") physical and Drug Screen. Claimant was also required as were all applicant's for her position to complete a State of California Department of Justice fingerprint criminal background check. Claimant was provided and completed all necessary certifications for the conduct of the above pre-employment checks.

Claimant stated in her application that she had never been convicted of a felony or misdemeanor. The Safety Manager of the Company's Oakland location received the results of Claimant's background check, including the criminal background check. The information received stated that Claimant had been charged and been convicted of a felony, which was later reduced to a misdemeanor. When confronted and asked why she had not provided the information regarding her prior conviction, she stated only that she felt that providing the requested information was not necessary. Claimant was advised by the Safety Manager that she had an obligation to report such information consistent with the language of the application which states:

> I certify that all statements made on this Application of Employment and in any subsequently executed medical questionnaire or any other employment documents are true and

HUD 000034

Julian Melendes
June 7, 2010
Page 3

> correct. I understand that any false information, including by
> omission, that I give may result in termination of my candidacy
> or any subsequent employment.

Claimant admitted to having failed to truthfully report her criminal conviction on her
employment application and was therefore terminated on March 20, 2009 for falsifying her
employment application.

Claimant was therefore never formerly employed by the Company, and did not at anytime
perform in her job. Claimant therefore could not, and does not, have any information upon
which to base her allegations, other than her subjective belief that her own termination was
discriminatory.

## IV.  Argument

In order to prevail on her claim, Claimant must first establish a *prima facie* case of
discrimination by providing evidence that she was: (1) a member of a protected class; (2)
performing her job in a satisfactory manner; (3) suffered an adverse employment action; and
(4) was treated differently from persons outside of her protected class. *McDonnell Douglas
Corp. v. Green* (1973) 411 U.S. 792, 802; see also *Guz v. Bechtel Nat'l, Inc.* (2000) 24 Cal.4th
317, 356.  If Claimant can establish a *prima facie* case, the burden then shifts to the
Defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment
action. *Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248, 250-252.  Once
Defendant has articulated such a reason, Claimant must produce evidence that its stated
reason is not only false, but in fact is a pretext for unlawful discrimination. *St. Mary's Honor
Center v. Hicks* (1993) 509 U.S. 502.

As set forth above, the Company can articulate non-discriminatory reasons for its actions in
this case.  Therefore, Claimant has the burden to establish that its explanations are, in fact,
pretext for unlawful discrimination. *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530
U.S. 133, 142.  To meet her burden, Claimant must come forward with "specific and
significantly probative evidence that the employer's alleged purpose is a pretext for
discrimination." *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 807;
*Steckl v. Motorola* (9th Cir. 1983) 703 F.2d 392, 393 ("[M]ere assertions that [an employer]
had discriminatory motivation and intent . . . [is] inadequate, without substantial factual
evidence, to raise . . . a genuine issue of material fact as to pretext in order to avoid summary
judgment").

HUD 000035

Julian Melendes
June 7, 2010
Page 4

Again, Plaintiff's claims are based on nothing.  She admitted to falisifying her application and was terminated for it.  While this may have upset her, it is not a basis for a claim of wrongful termination or discrimination of any type.

## V.      CONCLUSION

Based on the foregoing, we believe Claimant's claims to be without merit and respectfully request that the Commission issue a finding consistent with this position.

Very truly yours,

Ronald A. Peters

RAP/prl

HUD 000036

# EXHIBIT 36

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ELIZABETH HUNTER, LINDA STOIKE, and WILLIAM GARRAUGHTY, individually and on behalf of all others similarly situated, ) ) ) ) | |
| Plaintiffs, ) | Case No.: 09-CV-6178 |
| ) | |
| v. ) | Judge Rebecca R. Pallmeyer |
| ) | |
| FIRST TRANSIT, INC., ) | |
| ) | |
| Defendant. ) | |

| | |
|---|---|
| ) | |
| TASHA JOSHAWAY, ) MICHAEL YURKOWSKI, ) GEORGE BECKETT, DEBBIE GOIN and ) PENNIE JOHNSON, individually and on ) behalf of all others similarly situated, ) | Case No.: 10-CV-7002 |
| ) | Judge Rebecca R. Pallmeyer |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| FIRST STUDENT, INC., ) | |
| ) | |
| Defendant. ) | |

## AFFIDAVIT OF JASON A. SELVEY AS CORPORATE REPRESENTATIVE OF DEFENDANTS FIRST STUDENT, INC. AND FIRST TRANSIT, INC.

Jason A. Selvey, being duly sworn upon oath, states as follows:

1.      I am one of the attorneys representing Defendants First Transit, Inc. ("First

Transit") and First Student, Inc. ("First Student") in the above-captioned matters. I make this

affidavit as the corporate representative of First Student and First Transit based on my personal

knowledge of the investigation, methodology and procedures described herein, and on

information and belief as to the accuracy and completeness of the information communicated to me and the records provided to me during the course of that investigation.

## I.   Introduction

2.     Pursuant to the parties' September 27, 2010 letter agreement regarding the settlement, the parties agreed to undertake "reasonable confirmatory discovery as to the size of the subclasses." I submit this affidavit to document the "confirmatory discovery" undertaken by the Defendants and their counsel and the results thereof.

3.     Since approximately early 2010, the Defendants and their counsel have conducted an extensive investigation to identify members of each of the various subclasses and associated fund participant groups that have now been defined in the Settlement Agreement. In general, the Defendants and their counsel have relied on the Defendants' own records, as well as those of HireRight Solutions, Inc. ("HireRight"), J.J. Keller & Associates, Inc. ("J.J. Keller") and AFR Consortium Associates, LLC ("AFR"). In addition, where necessary, the Defendants and their counsel have obtained supplemental information through oral and e-mail inquiries to the Defendants' own employees, employees of their parent company, FirstGroup America, Inc. ("FirstGroup"), and employees of HireRight, J.J. Keller and AFR.

4.     I have been extensively involved in the investigation from the time of its commencement to the present. Below I explain and summarize the specific source materials and methodology the Defendants and their counsel have used to identify members of each of the various subclasses and fund participant groups defined in the Settlement Agreement and present the findings of the investigation.

2

II.    **Summary of Findings Regarding Subclass and Fund Participant Group Sizes**

5.     The Settlement Agreement defines a "Settlement Class" consisting of three subclasses: the "Disclosure Subclass," the "No Authorization Subclass," and the "Adverse Action Subclass" (collectively, the "Subclasses"). (Settlement Agreement at Section III.C.1. – III.C.4)

6.     In addition, for purposes of participating in the settlement, each Class Member is, with rare exceptions, only one of the following: a "Disclosure Fund Participant," a "No Authorization Fund Participant," a "No Authorization Terminated Fund Participant," or an "Adverse Action Fund Participant" (collectively, the "Participant Groups"). Moreover, the Settlement Agreement distinguishes between Adverse Action Fund Participants "who worked for the Defendants or its predecessors, Laidlaw Education or Laidlaw Transit, for more than thirty days and whose employment was terminated based on a consumer report during the class period" (the "Adverse Action Fund Participant Group (Incumbents)") and other Adverse Action Fund Participants (the "Adverse Action Fund Participant Group (Applicants)"). (*E.g.*, Settlement Agreement at Section VIII.E.4.)

7.     Based on their extensive investigation, the methodology of which I describe below, the Defendants and their counsel have identified the following approximate numbers of members or potential members in each of the Subclasses and Participant Groups:

- Disclosure Subclass – 143, 577 members

- No Authorization Subclass – 29,243 members

- Adverse Action Subclass (Incumbents) – 801 members

- Adverse Action Subclass (Applicants) – 6,390 members

- Disclosure Fund Participant Group – 107,909 members

3

- No Authorization Fund Participant Group – 28,488 members

- No Authorization Terminated Fund Participant Group – 295 members

- Adverse Action Fund Participant Group (Incumbents) – 506 members

- Adverse Action Fund Participant Group (Applicants) – 6,390 members

8.     The names and social security numbers of the members of the Participant Groups will be compiled and provided to the Settlement Administrator following preliminary approval of the settlement.

### III.     Disclosure Subclass

9.     Pursuant to the Settlement Agreement, "[a]n individual is a member of the Disclosure Subclass if and only if the individual satisfies both of the following conditions: (1) one of the Defendants procured a consumer report about the individual between October 5, 2007 and August 10, 2010; and (2) the Defendant that procured that consumer report made the disclosure required by 15 U.S.C. § 1681b(b)(2)(A)(i) using a document that contained a release of liability or that otherwise did not comply with that provision." (Settlement Agreement at Section III.C.2.)

10.     To identify members of the Disclosure Subclass, we relied on data generated by HireRight. As explained below, we understand that data to, collectively, contain all of the criminal background check reports (listed either individually or by package) ordered by FirstGroup entities, including FirstGroup, First Student, First Transit, and First Transit's subsidiary, First Vehicle Services, Inc. ("First Vehicle"), during the time period of October 1, 2007 through August 31, 2010, and include the name and social security number of the individual who was the subject of each report or package, among other information.

4

11.     Specifically, we relied on three database spreadsheets provided by HireRight at FirstGroup's request.  The first two spreadsheets resulted from the request of an employee of FirstGroup's Legal Department, which was directed to one of FirstGroup's contacts at HireRight, Clint Hill, for a list of each background check report ordered by a FirstGroup entity from October 1, 2007 through April 2010, along with other identifying information, such as the subjects' names, social security numbers and report dates.  After HireRight provided the two spreadsheets to us, we requested that Hill explain certain information in them and confirm their contents.  Hill directed our questions to another HireRight employee, Clint Buchanan, who confirmed that the first spreadsheet includes every criminal record report ordered by entities identified as FirstGroup entities between October 2007 and April 2010, and the second spreadsheet contains every criminal record report ordered by former Laidlaw branches using legacy Laidlaw account numbers between October 2007 and April 2010.  A few months later, we obtained the third spreadsheet by way of a request by the Coordinator of FirstGroup's centralized background checking unit that Hill provide a report listing all criminal background report packages ordered from May 1, 2010 through August 2010, with the subject's name and date of request.  Hill subsequently provided the information requested in the form of the third spreadsheet we relied on in our analysis.

12.     From the data in the three spreadsheets, I created a consolidated spreadsheet, containing one listing for each individual, including their name and their unique social security number, for whom a criminal background check report and/or report package was ordered from HireRight and/or its predecessor, USIS Commercial Services, Inc. ("USIS"), under accounts associated with First Student, First Transit, First Vehicle, LES, LT or FirstGroup (excluding

accounts associated with Greyhound Lines, Inc.) during the time period of October 5, 2007 through August 10, 2010 (the "Disclosure Subclass Spreadsheet").

13.     Using the sources and methodology described above, the Defendants and their counsel have identified 143,577 Disclosure Subclass members.

## IV.     No Authorization Subclass

14.     Pursuant to the Settlement Agreement, "[a]n individual is a member of the No Authorization Subclass if and only if the individual satisfies one or both of the following conditions: (1) between October 5, 2007 and August 10, 2010, a consumer report regarding the individual was procured and uploaded to the J.J. Keller & Associates, Inc. Driver Management Online database ("DMO"), and either: (i) the consumer report was uploaded to the DMO more than seven days before the individual's Part I Form was uploaded to the DMO, or (ii) no Part I Form for the individual was ever uploaded to the DMO; or (2) one of the Defendants procured from AFR a consumer report about the individual between October 5, 2007 and August 10, 2010." (Settlement Agreement at Section III.C.3.)

15.     As there are two scenarios under which an individual may qualify as a member of the No Authorization Subclass, I used two distinct sets of source materials and methodologies to identify No Authorization Subclass members.  As explained below, I identified individuals who qualify for the No Authorization Subclass under each of the two scenarios independently, then combined those membership lists and eliminated duplicative entries to produce a final list identifying unique No Authorization Subclass members.

### A.     Individuals Subject to a USIS Criminal Background Check Report

16.     In order to identify individuals meeting the criteria necessary to become a member of the No Authorization Subclass because "(1) between October 5, 2007 and August 10,

6

2010, a consumer report regarding the individual was procured and uploaded to the J.J. Keller &

Associates, Inc. Driver Management Online database ("DMO"), and either: (i) the consumer

report was uploaded to the DMO more than seven days before the individual's Part I Form was

uploaded to the DMO, or (ii) no Part I Form for the individual was ever uploaded to the DMO,"

(the "No Authorization Subclass (USIS Subset)"), the Defendants and their counsel relied on

three spreadsheets generated by J.J. Keller (the "J.J. Keller Spreadsheets").   I contacted a

FirstGroup contact at J.J. Keller, Randy Thome, who included another J.J. Keller employee in

our conversation, Aric Thoreson, and requested that J.J. Keller compile a database listing, for

each transitioning LES employee, their associated safety pack materials and criminal background

reports in the DMO with their upload dates.   Thoreson later sent us the final versions of the J.J.

Keller Spreadsheets we used in our analysis.   These spreadsheets list, by Laidlaw division, for

each of the LES employees in the United States as of approximately October 1, 2007, among

other data: (i) the individual's name; (ii) the individual's social security number; (iii) whether a

Part I Form for the individual was uploaded to the DMO; (iv) (if applicable) the date the Part I

Form for the individual was uploaded to the DMO; (v) (if applicable) a list of each criminal

background check report relating to the individual that was uploaded to the DMO; and (vi) (if

applicable) the date each criminal background check report relating to the individual in the DMO

was uploaded.[1]

    17.    Because an individual could qualify as a member of the No Authorization Class

(USIS Subset) in two separate ways, I used two distinct processes to identify members – one for

---

[1]    Based on our review of First Student's records and data provided by J.J. Keller, we understand that First Student procured or caused to be procured a USIS criminal background consumer report for virtually all LES employees, and that those reports were uploaded to the DMO by J.J. Keller.

individuals for whom the J.J. Keller Spreadsheets indicate a Part I Form was uploaded and one for individuals for whom the J.J. Keller Spreadsheets indicate a Part I Form was never uploaded.

18.     For individuals for whom the J.J. Keller Spreadsheets indicate a Part I Form was never uploaded, I created three spreadsheets based on the J.J. Keller spreadsheets.   These spreadsheets contain only one row of data regarding each individual for whom the J.J. Keller Spreadsheets indicate at least one criminal background check report was uploaded, which includes, among other information, their name and social security number (the "No Authorization Subclass (USIS Subset – Non-Returners) Spreadsheets").   Using this process, I identified 15,553 individuals who qualify as No Authorization (USIS Subset) members because they were subject of a criminal background check report that was uploaded to the DMO, but a Part I Form relating to them was never uploaded to the DMO.

19.     For individuals for whom the J.J. Keller Spreadsheets indicate a Part I form was uploaded to the DMO, determining whether they qualify as members of the No Authorization Subclass (USIS Subset) – *i.e.* whether a criminal background check report relating to them was uploaded to the DMO more than seven days before their Part I Form was uploaded to the DMO – was a far more complex process that involved extensive manipulation of J.J. Keller's data.   For this reason, the Defendants and their counsel engaged a third-party vendor with knowledge of Microsoft Excel's pivot table functions to analyze the data.

20.     Per my instructions, the third party vendor created three spreadsheets, each based on one of the J.J. Keller Spreadsheets, that contain one row of data for each individual listed on the relevant J.J. Keller Spreadsheet for whom a Part I Form was uploaded to the DMO, and list, among other data, the following for each individual listed: (i) the date their Part I Form was uploaded to the DMO, (ii) the earliest date a criminal background check report regarding them

was uploaded to the DMO, and (iii) the number of days that elapsed between the upload of their Part I Form and the upload of their earliest criminal background check report.

21.     After receiving the final drafts of the third party vendor's spreadsheets, I conducted a comprehensive review to ensure the data was accurate, including: (i) comparing each of the third party vendor's spreadsheets with the relevant J.J. Keller Spreadsheet to ensure they contain the same number of individuals for whom the data indicates a Part I Form was uploaded, (ii) comparing the Part I Form upload date in each of the third party vendor's spreadsheets with the relevant J.J. Keller Spreadsheet for a subset of individuals listed to ensure the data is consistent, (iii) comparing the earliest criminal background check report upload date in each of the third party vendor's spreadsheets with the relevant J.J. Keller Spreadsheet for a subset of individuals listed to ensure the data is consistent, (iv) reviewing the calculation of the number of days elapsed between the Part I Form upload and earliest criminal background check upload for a subset of individuals in each of the third party vendor's spreadsheets, and (v) reviewing the data in the relevant J.J. Keller Spreadsheet for a subset of individuals listed in each of the third party vendor's spreadsheets for whom no criminal background check report upload date is listed to ensure the data is consistent.  I found no mistakes in any of the third party vendor's final spreadsheets.

22.     Thereafter, I revised each of the third party vendor's spreadsheets, removing the entries for individuals with no criminal background check report upload date and removing the entries for individuals whose Part I Form was uploaded before or within seven days after the earliest date a criminal background check report regarding them was uploaded.  Using this process, I identified 12,117 individuals who qualify as No Authorization Subclass (USIS Subset) members because they were subject of a criminal background check report that was uploaded to

9

the DMO more than seven days before the Part I Form relating to them was uploaded to the DMO.

23.      After completing the two processes described above, I combined the entries in the No Authorization Subclass (USIS Subset – Non-Returners) Spreadsheets and No Authorization Subclass (USIS Subset – Returners) Spreadsheets to create a comprehensive list of the 27,670 No Authorization Subclass (USIS Subset) members identified (the "No Authorization Class (USIS Subset) Spreadsheet").

B.      Individuals Subject to an AFR Report

24.      In order to identify individuals meeting the criteria necessary to become a member of the No Authorization Subclass because "one of the Defendants procured from AFR a consumer report about the individual between October 5, 2007 and August 10, 2010" (the "No Authorization Subclass (AFR Subset)"), the Defendants and their counsel relied on three recordkeeping spreadsheets AFR maintained during the security review process, which AFR sent us final versions of after the closeout of its security review.  Based on communications with AFR Manager Patrick Pitt, we understand these spreadsheets to have been AFR's master working documents for the different phases of the security review in which AFR personnel tracked pertinent information regarding the individuals they investigated, including AFR's submissions to First Transit and First Student management, information regarding subsequent adjudication panel decisions and the employment status of individuals it learned from various First Transit and First Student sources.  Specifically, these spreadsheets are: (i) AFR's final closeout spreadsheet for the First Transit security review, which lists, among other information, the date(s) (if any) AFR transmitted a security review report regarding a First Transit employee to First Transit, and includes each such individual's social security number ("AFR First Transit

10

Spreadsheet"), (ii) AFR's final closeout spreadsheet for the earlier phase of the First Student security review, which lists, among other information, the individuals for whom AFR transmitted a security review report to First Student during that phase of the security review, and, usually, the date(s) of submission ("AFR First Student Phase 1 Spreadsheet"), and (iii) AFR's final closeout spreadsheet for the later phase of the First Student security review, which lists, among other information, the date(s) (if any) AFR transmitted a security review report regarding a First Student employee to First Student during that phase of the security review, and include each such individual's social security number ("AFR First Student Phase 2 Spreadsheet").

25.     As these three spreadsheets are the final versions of AFR's master recordkeeping spreadsheets for all three phases of the security review it performed for First Transit and First Student, we understand them to, collectively, list all of the security review reports AFR transmitted to First Transit and First Student from October 5, 2007 through August 10, 2010, by individual and, usually, include date(s).

26.     In order to use the AFR First Student Phase 1 Spreadsheet to identify subclass members, it was necessary to determine the social security numbers of the individuals listed for whom the spreadsheet indicated AFR submitted a security review report to First Student. For the majority of individuals with a name listed only once on the Disclosure Class Spreadsheet, my assistant recorded the social security number listed there. I determined the social security numbers for the remaining individuals by referencing the First Student location number listed for them in the AFR First Student Phase 1 Spreadsheet, and reviewing the actual AFR security review report regarding them when available (which usually includes the social security number), and the DMO database, which includes individuals' social security numbers.

11

27.     Thereafter, I used the data in the AFR First Student Phase 1 Spreadsheet and the social security numbers identified, as well as the AFR First Transit Spreadsheet and AFR First Student Phase 2 Spreadsheet, to identify members of the No Authorization Subclass (AFR Subset). I created a consolidated spreadsheet with one row of data for each individual, including their name and social security number, for whom AFR noted on one of its three recordkeeping spreadsheets, by date or other indication, that it transmitted a security review report to First Transit or First Student (the "No Authorization Subclass (AFR Subset) Spreadsheet"). To ensure that each individual identified was listed and counted only once, I included only one entry for each social security number identified in the No Authorization Subclass (AFR Subset) Spreadsheet by removing all entries associated with duplicative social security numbers.

28.     Using the sources and methodology described above, the Defendants and their counsel have identified 1,997 No Authorization Subclass (AFR Subset) members.

C.      Producing a Consolidated No Authorization Subclass Member List

29.     A substantial number of individuals qualify for membership in the No Authorization Subclass under both scenarios, and are listed in both the No Authorization Subclass (USIS Subset) Spreadsheet and the No Authorization Subclass (AFR Subset) Spreadsheet. Accordingly, I used the two spreadsheets to identify unique No Authorization Subclass members by creating a consolidated spreadsheet with only one row of data for each individual listed on either or both spreadsheets, which includes their name and social security number (the "No Authorization Subclass Spreadsheet"). To ensure that each individual identified was listed and counted only once, I included only one entry for each social security number identified in the No Authorization Subclass Spreadsheet by removing all entries associated with duplicative social security numbers.

12

30.     Using the sources and methodology described above, the Defendants and their counsel have identified 29,243 No Authorization Subclass members.

## V.     Adverse Action Subclass

31.     Pursuant to the Settlement Agreement, "[a]n individual is a member of the Adverse Action Subclass if and only if the individual satisfies all of the following conditions: (1) one of the Defendants procured a consumer report about the individual; (2) one of the Defendants took an adverse action against the individual based in whole or in part on the consumer report; (3) such adverse action took place between October 5, 2007 and August 10, 2010, and (4) the individual did not receive from First Transit or First Student both a copy of his or her consumer report and the FTC's Summary of FCRA Rights before suffering such adverse action, or as to which First Transit or First Student did not otherwise comply with the requirements of the FCRA." (Settlement Agreement at Section III.C.4.)

32.     As there are two scenarios under which an individual may qualify as a member of the Adverse Action Subclass – as an incumbent employee or as an employment applicant – two different sets of source materials and methodologies were required to identify incumbent employee Adverse Action Subclass members (the "Adverse Action Subclass (Incumbent Subset)") and employment applicant Adverse Action Subclass members (the "Adverse Action Subclass (Applicant Subset)").

### A.     First Transit and First Student Incumbent Employees

33.     The Defendants and their counsel used several different sources of information to identify members of the Adverse Action Subclass (Incumbent Subset).  This was necessary because, until approximately year-end 2009, the Defendants maintained no authoritative or comprehensive record of employees against whom they took an adverse action based in whole or

13

in part on a consumer report. Instead, the Defendants used a decentralized, multistep process to investigate their employees' criminal records, if any, and discharge employees based on their criminal records when they deemed it appropriate. Our understanding, based on communications with AFR Manager Patrick Pitt and the Defendants' relevant records, among other sources, is that, for most of the class period, AFR first reviewed the criminal background reports of certain employees with criminal records joining First Student from LES, and later reviewed the criminal background reports of certain incumbent First Student and First Transit employees with criminal records during a phased security review process. For a subset of these individuals, AFR prepared and submitted a report regarding their criminal backgrounds to an adjudication panel of First Transit or First Student management employees. For individuals the adjudication panels ordered discharged, a representative of the panel would communicate the decision to the appropriate First Transit branch general manager or First Student regional vice-president to effectuate the panel's decision. Thereafter, the First Transit branch general manager or First Student regional vice-president generally was supposed to terminate the employee identified and report back; however, based on our review of the Defendants' records and communications with FirstGroup and AFR personnel, neither result always occurred.

34.    Although the Defendants lack a comprehensive record recording the end results of this security review process, the Defendants and their counsel have been able to identify relevant categories of records generated at each step of the security review process. Accordingly, the Defendants and their counsel focused on analyzing the most relevant FirstGroup and AFR records that they could acquire through reasonable effort and communicating with the personnel of FirstGroup, the Defendants and AFR where appropriate to identify members of Adverse Action Subclass (Incumbent Subset).

14

35.     During the course of their investigation, the Defendants and their counsel determined that the records available to identify potential members of the Adverse Action Subclass (Incumbent Subset) who were employed by First Transit varied from those available to identify potential members who were employed by First Student, and the personnel involved in the security review process at the two companies varied as well.  The Defendants and their counsel were, however, consistent in attempting to err on the side of including individuals for whom some evidence existed supporting their qualifications in the final list of Adverse Action Subclass (Incumbent Subset) members identified.

36.     Not included in that list, however, are First Transit and First Student employees who were terminated after approximately December 2009.  Shortly after the above-captioned lawsuits were filed, at the request of FirstGroup's Legal Department, terminations ordered by First Transit and First Student's adjudication panels were put on hold, which is generally reflected in our review of the Defendants' relevant records.  Thereafter, beginning in early 2010, First Transit and First Student adopted new pre-adverse action procedures that unquestionably complied with the FCRA.  Therefore, only individuals terminated before these new procedures were enacted could be members of Adverse Action Subclass (Incumbent Subset).

1.     *First Transit Incumbent Employees*

37.     To identify members of the Adverse Action Subclass (Incumbent Subset) who First Transit employed (the "Adverse Action Subclass (First Transit Incumbent Subset)"), the Defendants and their counsel conducted an extensive investigation, including analyzing FirstGroup's and First Transit's relevant records; and making specific inquiries to FirstGroup, First Transit and AFR personnel, regarding the security review process and the circumstances of specific individuals who appeared to be potential members of the subclass.

15

38.     The Defendants and their counsel relied on four main documentary sources in identifying Adverse Action Subclass (First Transit Incumbent Subset) members:

i.      An archive of termination letters stemming from the security review process maintained by First Transit's then-Corporate Director of Human Resources, Russ Iddings, who we understand, based on communications with him and our review of First Transit's records, was responsible for instructing First Transit location general managers to terminate employees as part of First Transit's security review process (the "First Transit Termination Letters").

ii.     Iterations of an internal First Transit security review recordkeeping spreadsheet. Based on communications with Russ Iddings, we understand that this spreadsheet was maintained by First Transit's then-Human Resources Coordinator and is primarily based on information provided by AFR during the security review process, and includes individuals' names, locations, criminal history at issue and employment status (the "First Transit Security Review Spreadsheet").

iii.    The e-mail and hardcopy responses obtained from a request for information sent to all First Transit location general managers requesting, from October 1, 2007 to the date of the request (June 7, 2010): (i) "[l]etters and materials sent or given to employees who were terminated based on the results of background checks," or (ii) "a list of the names of employees terminated from October 1, 2007 to the present based on the results of background checks" if the correspondence was no longer available, or (iii) confirmation that no one from

16

their branch "has been terminated based on background checks" (the "First Transit E-mail Responses").

iv.     The security review e-mail correspondence archive of Michael Bogenschutz, who we understand to have been the liaison between the security review team and adjudication panel for a substantial portion of the First Transit security review process based on communications with him and as reflected in the archive itself. This e-mail archive contains many e-mails from adjudication panel members communicating their votes (the "First Transit E-mail Archive").

39.     The Defendants and their counsel also used several secondary sources of information in an effort to identify potential subclass members, and attempt to resolve instances where an individual's qualifications were in doubt:

i.     FirstGroup's payroll records regarding some individuals identified.

ii.     The AFR First Transit Spreadsheet, which, as explained above, we understand to include, among other information, the individuals for whom AFR submitted a security review report to First Transit management, and information communicated to AFR regarding the response of First Transit management and those individuals' employment statuses.

iii.     Files regarding arbitrations conducted pursuant to grievances filed by employees terminated on safety grounds and an electronic database listing such arbitrations and others (the "Arbitration Files").

iv.     The responses of First Transit branch personnel to e-mail and telephone inquiries regarding whether specific individuals were terminated based on the results of a criminal background check.

17

v.    AFR's First Transit security review archive, which, based on my review of the archive, generally contains the following regarding relevant individuals: (i) the security review report AFR submitted (if one was submitted), (ii) one or more criminal background check reports relating to the individual obtained during the security review process, (iii) the court records relating to the individual obtained during the security review process (if any were obtained), and (iv) portions of the individual's personnel file sent to AFR by the branch that employed them (if obtained).

40.    To compile a final list of the subclass members identified (the "Adverse Action Subclass (First Transit Incumbent Subset) Spreadsheet"), the Defendants and their counsel performed a complex analysis of all the main and secondary sources of information noted.  In general, the Defendants and their counsel have identified the individuals that the main documentary sources listed suggest were terminated and/or suspended without pay as a result of the security review process as Adverse Action Subclass (First Transit Incumbent Subset) members, unless there is stronger evidence to the contrary.  More specifically, the Adverse Action Subclass (First Transit Incumbent Subset) Spreadsheet includes individuals meeting the following criteria unless another of the main documentary sources or one of the secondary sources reviewed definitively, or at least more strongly indicates, that a given individual was not terminated and/or suspended without pay as a result of the security review process:

i.    Individuals for whom there is a First Transit Termination Letter.  Based on communications with Russ Iddings, it is our understanding that such individuals' general managers received the letter and instructions to terminate the individual,

18

thus making it at least somewhat likely that the individual was terminated or at least suspended without pay.

ii.     Individuals listed in an iteration of the First Transit Security Review Spreadsheet as having been issued a termination letter or as "[t]ermed" (or something similar) in the "Employee Status" column of the spreadsheet during the appropriate time period and after AFR had issued a security review report. Although FirstGroup has informed us that a "[t]ermed" notation does not definitively establish that an individual was terminated as a result of the security review process, that such individuals were being investigated and were terminated during the relevant time period supports the conclusion that that was the case.

iii.    Individuals whose terminations letters are included in or whose terminations are listed in the First Transit E-Mail Responses.

iv.     Individuals for whom there is a termination instruction e-mail in the First Transit E-mail Archive and those with one or more e-mails relating to them in which one or more members of the adjudication panel voted for their termination. Although not conclusive, such evidence that an individual was the subject of a termination letter issued to their general manager or, at least, adjudication panel members voted for their termination supports the conclusion that a given individual was terminated or at least suspended without pay.

41.     The secondary sources of information the Defendants and their counsel reviewed improved the quality of analysis, primarily by further affirming individuals' membership qualifications, calling individuals' membership qualifications into question so as to prompt further investigation, definitively establishing that certain individuals do not qualify for the

subclass and suggesting that other individuals not previously identified qualified for the subclass. By way of example:

    i.    If an individual tentatively included in the subclass was listed as active in FirstGroup's payroll records, that fact prompted further investigation. Conversely, if an individual was listed as inactive, that fact further affirmed their inclusion in the subclass.

    ii.    Through our review of the Defendants' records, we came to understand that there is a fair chance that individuals listed in the Arbitration Files in the "Safety Term" or "Background Check" categories were terminated as part of the security review process. Accordingly, the Arbitration Files proved useful in further affirming the inclusion of certain individuals in the subclass and suggesting that others could possibly be members, prompting further investigation.

    iii.    In some cases of conflicting or unclear records, I or FirstGroup personnel contacted the branch that employed the individual and they were able to definitively confirm whether the individual qualified for the subclass.

    42.    Using the sources and methodology described above, the Defendants and their counsel have identified 100 Adverse Action Subclass (First Transit Incumbent Subset) members.[2]

---

[2]    Consistent with the parties' philosophy of erring on the side of inclusion, the 100 individuals identified includes First Transit employees for whom it could not be easily determined whether they were terminated based in whole or in part on a criminal background check report.

2.    *First Student Incumbent Employees*

43.    As with First Transit, to identify members of the Adverse Action Subclass (Incumbent Subset) who First Student employed (the "Adverse Action Subclass (First Student Incumbent Subset)"), the Defendants and their counsel conducted an extensive investigation.

44.    The Defendants and their counsel relied on three main documentary sources in identifying Adverse Action Subclass (First Student Incumbent Subset) members from the first phase of the First Student security review process:

i.    Three spreadsheets provided to us by Michael Bogenschutz, who informed us, and First Student's records reflect, was one of the two individuals who acted as liaison between the security review team and adjudication panel, as well between the adjudication panel and local branches during the First Student Security review process.  Bogenschutz informed us that these spreadsheets list individuals for whom he sent termination instruction e-mails during the later part of the first phase of the First Student security review, and individuals for whom the other liaison, Bob Jenckes, sent termination instruction e-mails during the early portion of the first phase of the process, respectively (the "First Student Phase 1 Termination Lists").  Two of these spreadsheets also contain information regarding the listed individuals' employment statuses.

ii.    The e-mail and hardcopy responses obtained from a request for information sent to all First Student location contract managers requesting, from October 1, 2007 to the date of the request (June 7, 2010): (i) "[l]etters and materials sent or given to employees who were terminated based on the results of background checks," or (ii) "a list of the names of employees terminated from

21

October 1, 2007 to the present based on the results of background checks" if the correspondence was no longer available, or (iii) confirmation that no one from their branch "has been terminated based on background checks" (the "First Student E-mail Responses").

    iii.    The security review e-mail correspondence archive of the individual who we understand was the liaison between the security review team and adjudication panel, as well as the liaison between the adjudication panel and regional vice-presidents, beginning in the later portion of the first phase of the First Student security review process (the "First Student E-mail Archive"). This e-mail archive also contains many e-mails chains where adjudication panel members communicated their votes regarding individuals, primarily from the second phase of the First Student security review process.

45.    In identifying Adverse Action Subclass (First Student Incumbent Subset) members from the second phase of the First Student security review process, the Defendants and their counsel relied on five main documentary sources:

    i.    The AFR First Student Phase 2 Spreadsheet, which, as explained above, we understand to include, among other information, the individuals for whom AFR submitted a security review report to First Student management, and information communicated to AFR regarding the response of First Student management and those individuals' employment statuses.

    ii.    Two spreadsheets generated at the request of the Defendants and their counsel by the individual who we understand was the liaison between the security review team and adjudication panel, as well as the liaison between the

adjudication panel and regional vice-presidents, during the second phase of the First Student security review process (the "First Student Status Spreadsheets"). In these spreadsheets, he provides his knowledge concerning the adjudication status of the individuals listed as either "terminated" or "no result received" from First Student in the final AFR Phase 2 Spreadsheet.

iii.    The First Student E-mail Responses.

iv.    The First Student E-mail Archive.

v.    Copies of e-mail correspondence instructing the termination of individuals during the security review process maintained by First Student regional vice-presidents (the "First Student RVP E-mails").

46.    The Defendants and their counsel also used several secondary sources of information in an effort to identify potential subclass members, and attempt to resolve instances where an individual's qualifications were in doubt:

i.    FirstGroup's payroll records regarding some individuals identified.

ii.    A spreadsheet maintained by the individual who we understand was the liaison between the security review team and adjudication panel, as well as the liaison between the adjudication panel and regional vice-presidents, beginning in the later portion of the first phase of the security review (the "First Student Adjudication Spreadsheet"). Based on communications with the individual, we understand the spreadsheet to list, for some individuals reviewed, the adjudication panel's votes and when the appropriate regional vice-president was instructed to terminate the individual (if applicable).

iii.    Communications with the individual who we understand was the liaison between the security review team and adjudication panel, as well as the liaison between the adjudication panel and regional vice-presidents, beginning in the later portion of the first phase of the First Student security review process regarding the adjudication status of specific individuals.

iv.    Communications with AFR personnel regarding the adjudication status of specific individuals.

v.    The Arbitration Files.

vi.    The responses of First Student branch personnel to e-mail and telephone inquiries regarding whether certain specific individuals were terminated based on the results of a criminal background check.

vii.    The AFR First Student Phase 1 Spreadsheet, which, as explained above, we understand to include, among other information, the individuals for whom AFR submitted a security review report to First Student management, and information communicated to AFR regarding the response of First Student management and those individuals' employment statuses.

viii.    AFR's security review archive for the first phase of the First Student security review, which, based on my review, may contain any or all of the following documents for relevant individuals: (i) the security review report submitted by AFR to First Student management (if one was submitted), (ii) one or more criminal background check reports relating to the individual obtained during the security review process, (iii) the court records relating to the individual obtained during the security review process (if any were obtained), (iv) portions

24

of the individual's personnel file sent to AFR by the branch that employed them (if obtained), (v) e-mail correspondence from AFR submitting its reports to the adjudication panel for decision, (vi) e-mail correspondence in which adjudication panel members submitted their votes regarding whether to terminate the individual, and (vii) e-mail correspondence communicating the adjudication panel's termination instructions to the appropriate First Student regional vice-president.

ix.   A list generated by FirstGroup personnel that FirstGroup informed us contains the names of a subset of individuals for whom an e-mail with termination instructions was sent to a First Student regional vice-president during the early portion of the first phase of the First Student security review process. In addition, we relied on branch responses to an inquiry regarding whether certain individuals identified were or were not terminated on the basis of a criminal background check.

x.   AFR's security review archive for the second phase of the First Student security review, which generally contains the following regarding relevant individuals: (i) the security review report submitted by AFR to First Student management (if one was submitted), (ii) one or more criminal background check reports relating to the individual obtained during the security review process, (iii) the court records relating to the individual obtained during the security review process (if any were obtained), and (iv) portions of the individual's personnel file sent to AFR by the branch that employed them (if obtained).

47.    As with First Transit, to compile a final list of the subclass members identified (the "Adverse Action Subclass (First Student Incumbent Subset) Spreadsheet"), the Defendants and their counsel performed a complex analysis of all the main and secondary sources of information noted.  In general, the Defendants and their counsel have identified the individuals that the main documentary sources listed suggest were terminated and/or suspended without pay as a result of the security review process as Adverse Action Subclass (First Student Incumbent Subset) members, unless there is stronger evidence to the contrary.   More specifically, the Adverse Action Subclass (First Student Incumbent Subset) Spreadsheet includes individuals meeting the following criteria unless another of the main documentary sources or one of the secondary sources reviewed definitively, or at least more strongly indicates, that a given individual was not terminated and/or suspended without pay as a result of the security review process:

  i.     Individuals listed in the First Student Phase 1 Termination Lists.  Our understanding, based on communications with Michael Bogenschutz and consistent with our investigation of First Student's records, is that the appropriate regional vice-presidents received letters and instructions to terminate these individuals, thus making it at least somewhat likely that they were terminated or at least suspended without pay.

  ii.    Individuals whose terminations letters are included in or whose terminations are listed in the First Student E-Mail Responses.

  iii.   Individuals for whom there is a termination instruction e-mail in the First Student E-mail Archive and those with one or more e-mails relating to them in which one or more members of the adjudication panel voted for their termination.

26

Although not conclusive, such evidence that an individual was the subject of a termination letter issued to the appropriate regional vice-president or at least adjudication panel members voted for their termination supports the conclusion that a given individual was terminated or at least suspended without pay.

48.     With regard to the second phase of the First Student security review, the Adverse Action Subclass (First Student Incumbent Subset) Spreadsheet includes individuals meeting the following criteria unless another of the main documentary sources or one of the secondary sources reviewed definitively, or at least more strongly indicates, that a given individual was not terminated and/or suspended without pay as a result of the security review process:

i.     Individuals listed in the AFR Phase 2 Spreadsheet as "TERMINATED" in response to the AFR security review report submitted to First Student who the First Student Status Spreadsheets do not indicate were not terminated, or at least suspended without pay.  Based on communications with Michael Bogenschutz, which are largely reflected in the First Student Status Spreadsheets, and the results of our own investigation, we understand that, for nearly all such individuals, AFR submitted a security review report to First Student, a termination instruction letter was subsequently sent to the appropriate regional vice-president regarding the individual, and AFR learned that the individual's employment had been terminated.  Although not definitive, when taken together, this evidence suggests it is at least somewhat likely that these individuals were terminated as part of the security review process.

ii.     Individuals listed in the AFR Phase 2 Spreadsheet: (i) for whom AFR noted it had not received a response from First Student regarding the security

27

review report submitted, and (ii) who are listed in the First Student Status Spreadsheets as having been ordered suspended or terminated or as having a pending case.   In the absence of more definitive information, such evidence suggests that it is at least somewhat likely that these individuals were terminated as part of the security review process.

iii.      Individuals whose terminations letters are included in or whose terminations are listed in the First Student E-Mail Responses.

iv.      Individuals for whom there is a termination instruction e-mail in the First Student E-mail Archive and those with one or more e-mails relating to them in which one or more members of the adjudication panel voted for their termination.

v.      Individuals for whom there is a termination instruction e-mail in the First Student RVP E-mails, as the appropriate regional vice-president was at least instructed to terminate such individuals.

49.      As with First Transit, the secondary sources of information the Defendants and their counsel reviewed improved the quality of analysis, primarily by further affirming individuals' membership qualifications, calling individuals' membership qualifications into question so as to prompt further investigation, definitively establishing that certain individuals do not qualify for the subclass and suggesting that other individuals not previously identified qualified for the subclass.  By way of example:

i.      If an individual tentatively included in the subclass was listed as active in FirstGroup's payroll records, that fact prompted further investigation. Conversely, if an individual was listed as inactive, that fact further affirmed their inclusion in the subclass.

28

ii.     For the same reasons discussed above with regard to First Transit, the Arbitration Files and branch e-mail correspondence proved useful in further affirming the inclusion of certain individuals in the subclass and suggesting that others could possibly be members, prompting further investigation.

iii.    If the First Student Adjudication Spreadsheet indicates that a termination letter was sent regarding an identified individual, or at least that the adjudication panel voted to terminate or suspend them, it provided additional evidence that the individual qualified for the subclass.

iv.    In some cases of conflicting or unclear records, I or FirstGroup personnel contacted the individual who we understand was the liaison between the security review team and adjudication panel, as well as the liaison between the adjudication panel and regional vice-presidents, beginning in the later portion of the first phase of the First Student security review process, and he was able to determine the individual's status.

v.     In some cases of conflicting or unclear records, I or FirstGroup personnel contacted the branch that employed the individual and they were able to definitively confirm whether the individual qualified for the subclass.

50.    Using the sources and methodology described above, the Defendants and their counsel have identified 701 Adverse Action Subclass (First Student Incumbent Subset) members.

3.    *Consolidating the Lists of First Transit and First Student Incumbent Employees*

51.    After completing the processes described in Sections V.A.1. and V.A.2., I created a comprehensive list of the 801 potential Adverse Action Subclass (Incumbent Subset) members

identified (the "Adverse Action Subclass (Incumbent Subset) Spreadsheet"), including their names and social security numbers.

B.    First Transit and First Student Applicants for Employment

52.    For practical purposes, the Settlement Agreement defines the Adverse Action Subclass (Applicant Subset) as individuals who qualify as members of the Adverse Action Subclass who did not "work[] for the Defendants or its predecessors, Laidlaw Education or Laidlaw Transit, for more than thirty days." (*See* Settlement Agreement at Section VIII.E.4.)

53.    The parties have concluded that, based on a reasonable review of the Defendants' records, identifying the members of the Adverse Action Subclass (Applicant Subset) with any degree of precision would not be possible. Under these circumstances, the parties have agreed that the most reasonable course of action is to use data that the Defendants were able to obtain with a reasonable amount of effort to identify individuals who may potentially be members of the Adverse Action Subclass (Applicant Subset), and require the individuals so identified to execute a Claim Form in which they make the following declaration: "I hereby declare, under penalty of perjury, that to the best of my knowledge and belief, First Transit or First Student rejected me for employment. I also declare, under penalty of perjury, that I did not voluntarily abandon my job application with First Transit or First Student."

54.    Based on communications with Russ Iddings and the Coordinator of the centralized background checking unit FirstGroup formed, it is our understanding that, during the class period of October 5, 2007 to August 10, 2010, it was First Transit's and First Student's policy to order one of a discrete set of packages of criminal background check reports from USIS, and later HireRight, for all employment applicants. These packages are all known as "GAP Packages." The same individuals indicated that it was First Transit and First Student's

30

policy during the class period to order GAP Packages only for employment applicants, and not incumbent employees. Accordingly, we made the reasonable assumption that individuals for whom First Transit and First Student ordered a GAP Package from USIS or HireRight were applicants for employment with First Transit or First Student.

55.     Under these circumstances, the Defendants and their counsel determined a feasible method to identify individuals who may potentially be members of the Adverse Action Subclass (Applicant Subset) based on data they could assemble or acquire. In this two step process, and with the aid of a third party vendor, I used two spreadsheets and one database generated by HireRight personnel and a spreadsheet and other information provided by FirstGroup personnel. In the first step of the process, I and the third party vendor used the two spreadsheets and one database generated by HireRight personnel to identify and create a preliminary list of potential members of the Adverse Action Subclass (Applicant Subset). In the second step of the process, I used the a spreadsheet and other information provided by FirstGroup personnel to remove individuals included on the list created in the first step who, based on FirstGroup's payroll records, do not qualify for the Adverse Action Subclass (Applicant Subset).

56.     An employee of FirstGroup's Legal Department requested that Hill generate a database listing all GAP Package reports ordered by FirstGroup entities from October 2007 to the then-present. As Hill subsequently explained, the final version of the HireRight database that I and the third party vendor relied on in this process, lists all criminal background report packages ordered by FirstGroup entities since October 2007, including GAP Packages. As relevant to our analysis, the database includes, among other information, each of the various First Transit, First Student and First Vehicle GAP Packages ordered from October 1, 2007 through

31

June 9, 2010, and includes the name and social security number of the individual subject to each package.

57.     The two HireRight spreadsheets that I and the third party vendor used in this process are the first two spreadsheets discussed in Paragraph 11 above. For the same reasons discussed in Paragraph 11, we understand the two spreadsheets to contain all of the criminal background check reports ordered by FirstGroup entities, including those ordered by branches under legacy Laidlaw account numbers, during the time period of October 1, 2007 through August 31, 2010, and include the name and social security number of the individual who was the subject of each report. These spreadsheets also list the result of each report – *i.e.* whether it contained derogatory information (had a "HIT").

58.     Using the HireRight database and spreadsheets to identify potential members of the Adverse Action Subclass (Applicant Subset) is appropriate because they provide the identities of First Student, First Transit and First Vehicle applicants during the time period of October 5, 2007 through March 14, 2010,[3] as well as the results of each of the individual's criminal background check reports. Taken together, the data yields the identities of applicants with derogatory criminal background check reports – *i.e.* potential Adverse Action Subclass (Applicant Subset) members.

59.     Due to the complexity of the data, the Defendants and their counsel engaged a third party vendor with knowledge of advanced features of Microsoft Access and Microsoft Excel to analyze the data. Per my instructions, the third party vendor created a spreadsheet with one listing for each unique individual (determined by social security number) who: (i) the

---

[3]     Based on communications with FirstGroup personnel, it is my understanding that FirstGroup created a new centralized background checking unit (the "CBCU") as of March 15, 2010 whose pre-adverse action procedures are unquestionably compliant with the FCRA.

HireRight database indicates was the subject of one or more First Student, First Transit or First Vehicle GAP Packages ordered during the time period of October 5, 2007 and May 15, 2010, and (ii) the HireRight spreadsheets indicate was the subject of one or more criminal background check reports with a derogatory result ordered from HireRight and/or USIS, under accounts associated with First Student, First Vehicle, LES, LT or FirstGroup (excluding accounts associated with Greyhound Lines, Inc.) during time period of October 5, 2007 through April 30, 2010. The spreadsheet includes, among other information, the listed individuals' names and social security numbers and data relating to the first (or only) relevant GAP Package ordered regarding them.

60.     After receiving the third party vendor's spreadsheet, I conducted a comprehensive review to ensure the data therein was accurate, including: (i) verifying that no individuals were included who did not have a First Student, First Transit or First Vehicle GAP Package ordered regarding them during the time period of October 5, 2007 and May 15, 2010, (ii) verifying that no individuals were included who were not the subject of a criminal background check report with a derogatory result ordered under accounts associated with First Student, First Vehicle, LES, LT or FirstGroup (excluding accounts associated with Greyhound Lines, Inc.), (iii) verifying that only one listing per social security number remained, (iv) reviewing a subset of the individuals listed to ensure the only GAP Package data listed is associated with the earliest GAP Package ordered for that individual, and (v) reviewing the records of a subset of individuals listed in the original HireRight database to ensure they were appropriately included or not included in the final spreadsheet based on the criteria noted.

33

61.    Thereafter, I removed all listings for individuals who were only subject of a GAP Package ordered on March 15, 2010 or later to account for the creation of the CBCU and its unquestionably FCRA-compliant procedures.

62.    After completing the first step of the two step process we employed, 12,639 potential Adverse Action Subclass (Applicant Subset) members had been identified.

63.    In the second step of the process, I eliminated individuals from the potential subclass member pool with the assistance of FirstGroup personnel by using FirstGroup's payroll records. FirstGroup personnel ran the names and social security numbers of the 12,639 potential Adverse Action Subclass (Applicant Subset) members that had been identified in their payroll systems, and provided me with a spreadsheet that they informed me lists the data in their systems (if any) regarding each such individual's first date of hire, last date of rehire and last date of termination by First Transit, First Student, First Vehicle, FirstGroup or LES, among other information. This data appropriately allowed me to eliminate individuals who "worked for the Defendants or its predecessors, Laidlaw Education or Laidlaw Transit, for more than thirty days" as, for practical purposes, they could not be members of the Adverse Action Subclass (Applicant Subset). (*See* Settlement Agreement at Section VIII.E.4.)

64.    I employed three different processes to analyze the 12,639 potential subclass members' payroll data. The method I used depended on whether FirstGroup had no record of employing them, FirstGroup had a record of hiring them, but no record of rehiring them, or whether FirstGroup had records of hiring and rehiring them.

65.    First, I created a spreadsheet listing the 4,941 individuals FirstGroup had no record of employing. FirstGroup personnel informed me that these individuals were not employed by FirstGroup, First Transit, First Student, First Vehicle, LES or LT during period of

34

October 5, 2007 to the present. Accordingly, I made the reasonable assumption that such individuals were unsuccessful employment applicants at some point after October 5, 2007.

66.    Second, I created a spreadsheet listing the 6,231 individuals FirstGroup had a record of hiring, but no record of rehiring. From this spreadsheet, I eliminated the entries for individuals with no termination date listed, as FirstGroup personnel confirmed such individuals would still be employed, and other individuals FirstGroup personnel confirmed were still employed. I also eliminated the entries for individuals whose listed termination date is at least 31 days after their listed hire date, but only if their listed termination date is October 5, 2007 or later, because these individuals worked during the class period and worked for at least 30 days. I considered the remaining 1,191 individuals listed to be potential Adverse Action Subclass (Applicant Subset) members.

67.    Third, I created a spreadsheet listing the 1,467 individuals FirstGroup had a record of hiring and rehiring. From this spreadsheet, I eliminated the entries for individuals with either no termination date listed or a listed rehire date later in time than their listed termination date, as FirstGroup personnel confirmed such individuals would still be employed. FirstGroup personnel also confirmed that certain other individuals on the spreadsheet were still employed, and I removed their entries from the spreadsheet as well. I also eliminated the entries for individuals whose listed termination date is at least 31 days after their listed rehire date, but only if their listed termination date is October 5, 2007 or later, because these individuals worked during the class period and worked for at least 30 days. I considered the remaining 258 individuals listed to be potential Adverse Action Subclass (Applicant Subset) members.

68.    After completing these steps, I combined the entries in the three spreadsheets I generated to create a comprehensive list of the 6,390 potential Adverse Action Subclass

35

(Applicant Subset) members we identified (the "Adverse Action Subclass (Applicant Subset) Spreadsheet").[4]

## VI.   Disclosure Fund Participants

69.     Pursuant to the Settlement Agreement, "[a] Class Member is a Disclosure Fund Participant if he or she is is a member of the Disclosure Subclass but not a member of the No Authorization Subclass or the Adverse Action Subclass." (Settlement Agreement at Section VIII.D.1.)

70.     In order to identify the Disclosure Fund Participants, I used four of the spreadsheets I created that are described herein: (i) the Disclosure Subclass Spreadsheet, (ii) the No Authorization Subclass Spreadsheet, (iii) the Adverse Action Subclass (Incumbent Subset) Spreadsheet, and (iv) the Adverse Action Subclass (Applicant Subset) Spreadsheet.

71.     Using these four spreadsheets, I followed a multistep process to pare down the Disclosure Subclass Spreadsheet to the point that it only contains one entry for each of the Disclosure Fund Participants, including their names and social security numbers.   First, I identified the social security numbers listed in both the Disclosure Subclass Spreadsheet and the No Authorization Subclass Spreadsheet, and eliminated the entries for the individuals associated with those social security numbers from the Disclosure Subclass Spreadsheet.   Second, I identified the social security numbers listed in both the Disclosure Subclass Spreadsheet, as edited in the first step, and the Adverse Action Subclass (Incumbent Subclass) Spreadsheet, and

---

[4]     The parties agree that this number of potential subclass members in all likelihood substantially overstates the number of applicants who were in fact rejected for employment based on the results of their criminal background check, as opposed to, for example, voluntarily abandoning their application. Nevertheless, the parties have agreed to err on the side of overinclusiveness. Thus, all 6,390 individuals will receive a class notice for the Adverse Action Subclass, but will be required as a condition to subclass membership to certify under penalty of perjury that they were rejected for employment and did not voluntarily abandon their application.

eliminated the entries for the individuals associated with those social security numbers from the Disclosure Subclass Spreadsheet, as edited in the first step. Third, I identified the social security numbers listed in both the Disclosure Subclass Spreadsheet, as edited in the second step, and the Adverse Action Subclass (Applicant Subset) Spreadsheet, and eliminated the entries for the individuals associated with those social security numbers from the Disclosure Subclass Spreadsheet, as edited in the second step.

72.    Following this three-step process, I created a spreadsheet listing the names and social security numbers of each of the 107,909 Disclosure Fund Participants we identified.

### VII.    No Authorization Fund Participants

73.    Pursuant to the Settlement Agreement, "[a] Class Member is a No Authorization Fund Participant if he or she is a member of the Disclosure Subclass and No Authorization Subclass, but he or she is not a member of the Adverse Action Subclass." (Settlement Agreement at Section VIII.D.2.)

74.    As required by the group's definition, I confirmed that all members of the No Authorization Subclass are also members of the Disclosure Subclass by verifying that the social security numbers listed in the No Authorization Subclass Spreadsheet are also listed in the Disclosure Subclass Spreadsheet.

75.    To identify No Authorization Fund Participants, I used two of the spreadsheets I created described herein: (i) the No Authorization Subclass Spreadsheet, and (ii) the Adverse Action Subclass (Incumbent Subset) Spreadsheet.  Using the No Authorization Subclass Spreadsheet as a starting point, I pared it down such that it only contained one entry for each of the No Authorization Fund Participants, including their name and social security number. Specifically, I identified the social security numbers listed in both the No Authorization Subclass

37

Spreadsheet and the Adverse Action Subclass (Incumbent Subset) Spreadsheet, and eliminated the entries for the individuals associated with those social security numbers from the No Authorization Subclass Spreadsheet.

76.     By comparing the social security numbers listed on the No Authorization Subclass Spreadsheet and those listed on the Adverse Action Subclass (Applicant Subset) Spreadsheet, I determined that 10 individuals qualify as No Authorization Subclass members, but are also potential Adverse Action Subclass (Applicant Subset) members. Pursuant to the terms of the Settlement Agreement (at Section VIII.D.2. fn. 2), I identified these individuals as No Authorization Fund Participants.

77.     Following this process, I created a spreadsheet listing the names and social security numbers of each of the 28,488 No Authorization Fund Participants we identified.

## VIII.   No Authorization Terminated Fund Participants

78.     Pursuant to the Settlement Agreement, "[a] Class Member is a No Authorization Terminated Fund Participant if he or she satisfies all of the following conditions: (a) he or she is a member of the Disclosure Subclass, No Authorization Subclass, and Adverse Action Subclass, (b) his or her employment was terminated by one of the Defendants based in whole or in part on a consumer report procured by one of the Defendants (c) between October 5, 2007 and August 10, 2010, a consumer report regarding the individual was procured and uploaded to the J.J. Keller & Associates, Inc. Driver Management Online database ('DMO'), and either: (i) the consumer report was uploaded to the DMO more than seven days before the individual's Part I Form was uploaded to the DMO, or (ii) no Part I Form for the individual was ever uploaded to the DMO." (Settlement Agreement at Section VIII.D.3.)

79.     As required by the group's definition, I confirmed that all members of the Adverse Action Subclass are also members of the Disclosure Subclass by verifying that the social security numbers listed in the Adverse Action Subclass (Incumbent Subset) Spreadsheet and Adverse Action Subclass (Applicant Subset) Spreadsheet are also listed in the Disclosure Subclass Spreadsheet.

80.     To identify No Authorization Terminated Fund Participants, I used two of the spreadsheets I created described herein: (i) the Adverse Action Subclass (Incumbent Subset) Spreadsheet, and (ii) the No Authorization Subclass (USIS Subset) Spreadsheet.  Using the Adverse Action Subclass (Incumbent Subset) Spreadsheet as a starting point, I pared it down such that it only contained one entry for each of the No Authorization Terminated Fund Participants, including their names and social security numbers.  Specifically, I identified the social security numbers listed in both the Adverse Action Subclass (Incumbent Subset) Spreadsheet, and (ii) the No Authorization Subclass (USIS Subset) Spreadsheet, and eliminated the entries for all individuals not associated with those social security numbers from the Adverse Action Subclass (Incumbent Subset) Spreadsheet.

81.     Following this process, I created a spreadsheet listing the names and social security numbers of each of the 295 No Authorization Terminated Fund Participants we identified (the "No Authorization Terminated Fund Participants Spreadsheet").

### IX.     Adverse Action Fund Participants

82.     Pursuant to the Settlement Agreement, "[a] Class Member is an Adverse Action Fund Participant if he or she is a member of the Disclosure Subclass and the Adverse Action Subclass, but he or she is not a No Authorization Terminated Fund Participant." (Settlement Agreement at Section VIII.D.4.)  In addition, the Settlement Agreement distinguishes between

39

the Adverse Action Fund Participant Group (Incumbents) and the Adverse Action Fund Participant Group (Applicants) for purposes of payment. Accordingly, we identified the two types of Adverse Action Fund Participants separately.[5]

### A.     Incumbent Employees

83.     In order to identify individuals in the Adverse Action Fund Participant Group (Incumbents), I used two of the spreadsheets I created described herein: (i) the Adverse Action Subclass (Incumbent Subset) Spreadsheet, and (ii) the No Authorization Terminated Fund Participants Spreadsheet. Using the Adverse Action Subclass (Incumbent Subset) Spreadsheet as a starting point, I pared it down such that it only contained one entry for each of the Adverse Action Fund Participants (Incumbents). Specifically, I identified the social security numbers listed in both the Adverse Action Subclass (Incumbent Subset) Spreadsheet and the No Authorization Terminated Fund Participants Spreadsheet, and eliminated the entries for the individuals associated with those social security numbers from the Adverse Action Subclass (Incumbent Subset) Spreadsheet to create the Adverse Action Fund Participants (Incumbents) Spreadsheet.

84.     Following this process, I created a spreadsheet listing the names and social security numbers of each of the 506 Adverse Action Fund Participants (Incumbents) we identified.

### B.     Employment Applicants

85.     Because all members of the Adverse Action Subclass are also members of the Disclosure Subclass and no members of the Adverse Action Subclass (Applicant Subset) are No

---

[5]     By using the procedures described below and identifying the two types of Adverse Action Fund Participants separately, I identified one individual who may meet the criteria of both of the Adverse Action Fund Participant Groups. Pursuant to the settlement agreement (at Section VIII.E.4. fn. 3), I identified this individual as a member of both Groups.

Authorization Terminated Fund Participants, the Adverse Action Fund Participants (Applicants) and the Adverse Action Subclass (Applicant Subset) are comprised of the same individuals. Accordingly, the Adverse Action Subclass (Applicant Subset) Spreadsheet I created contains the names and social security numbers of each of the 6,390 Adverse Action Fund Participants (Applicants) we identified.

FURTHER THE AFFIANT SAYETH NOT.

JASON A. SELVEY

SIGNED AND SWORN TO
BEFORE ME THIS _3rd_ DAY
OF MARCH, 2011

NOTARY PUBLIC

OFFICIAL SEAL
HIND SAMONA
Notary Public - State of Illinois
My Commission Expires Nov 08, 2014

41

# EXHIBIT 37

# DOCUMENTS FILED UNDER SEAL PURSUANT TO THE STIPULATION OF CONFIDENTIALITY AND PROTECTIVE ORDER