1 | Matthew J. Piers (IL SB #2206161)
(Admitted *Pro Hac Vice*)
2 | mpiers@hsplegal.com
Kalman D. Resnick (IL SB #2318482)
3 | (Admitted *Pro Hac Vice*)
kresnick@hsplegal.com
4 | Christopher J. Wilmes (IL SB # 6287688)
(Admitted *Pro Hac Vice*)
5 | cwilmes@hsplegal.com
HUGHES SOCOL PIERS RESNICK & DYM
6 | 70 W. Madison Street, Suite 4000
Chicago, IL 60602
7 | (312) 580-0100; (312) 580-1994 (Fax)

8 | Teresa Demchak (SB #123989)
tdemchak@gdblegal.com
9 | Roberta L. Steele (SB #188198)
rsteele@gdblegal.com
10 | James Kan (SB #240749)
jkan@gdblegal.com
11 | GOLDSTEIN, DEMCHAK, BALLER, BORGEN & DARDARIAN
300 Lakeside Drive, Suite 1000
12 | Oakland, CA 94612
(510) 763-9800; (510) 835-1417 (Fax)
13 |
Madeline Neighly (SB #259785)
14 | mneighly@nelp.org
NATIONAL EMPLOYMENT LAW PROJECT
15 | 405 14th Street, Suite 1400
Oakland, CA 94612
16 | (510) 663-5707; (510) 663-2028 (Fax)

17 | Counsel for Plaintiff Adrienne Hudson

18 | <center>UNITED STATES DISTRICT COURT</center>

19 | <center>NORTHERN DISTRICT OF CALIFORNIA</center>

| | |
|---|---|
| 20 ADRIENNE HUDSON, individually and on behalf of all others similarly situated, | Case No.: C10-03158 WHA |
| 21 | CLASS ACTION |
| 22         Plaintiff, | **DECLARATION OF JAMES KAN IN SUPPORT OF PLAINTIFF'S UNOPPOSED** |
| 23 vs. | **MOTION TO DISMISS PLAINTIFF'S INDIVIDUAL CLAIMS WITH PREJUDICE** |
| 24 FIRST TRANSIT, INC., | **AND CLASS CLAIMS WITHOUT PREJUDICE AND WITHOUT CLASSWIDE** |
| 25         Defendant. | **NOTICE** |
| 26 | Date: August 18, 2011 |
| 27 | Time: 8:00 a.m.<br>Ctrm: 9, 19th Floor |
| 28 | Judge: Hon. William H. Alsup |

1       I, James Kan, declare the following:

2       1.      I am an associate at Goldstein, Demchak, Baller, Borgen & Dardarian and one of the

3 attorneys of record for Plaintiff in this action.

4       2.      I make this Declaration in Support of Plaintiff's Motion to Dismiss Plaintiff's

5 Individual Claims With Prejudice and Class Claims Without Prejudice and Without Class-Wide

6 Notice. The statements made in this declaration are made of my own personal knowledge and if called

7 as a witness, I could and would testify competently to the matters stated below.

8 <div align="center">**EXTENSIVE LITIGATION AND DISCOVERY HISTORY**</div>

9       3.      Plaintiff and First Transit vigorously litigated this case. Both sides engaged in

10 extensive discovery, including depositions, document productions, and interrogatories. Plaintiffs

11 propounded and First Transit responded to two sets of requests for production of documents and

12 produced to Plaintiff approximately 220,000 pages of documents regarding company policies and

13 procedures, location contracts, and criminal background check reports covering over 150 locations

14 nationwide. First Transit also produced approximately 4 gigabytes of work force data from its ADP

15 payroll (active) and PeopleSoft (legacy) databases, which Plaintiff's expert analyzed. Plaintiff

16 responded to interrogatories and produced documents in her possession to First Transit. Additionally,

17 Plaintiff conducted the depositions of 9 First Transit corporate and third-party witnesses over 12 days,

18 including 7 depositions pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure on topics

19 regarding policies and procedures relating to the external application and hiring processes, internal and

20 external job postings and other advertisements for the covered positions, criminal background checks

21 and related policies, procedures, and practices, and adverse impact analyses/compliance with the

22 Uniform Guidelines on Employee Selection Procedures. First Transit took the deposition of Plaintiff

23 Adrienne Hudson.

24       4.      After the completion of this exhaustive and extensive fact discovery, the parties fully

25 briefed the issue of class certification. On July 7, 2011, Plaintiff served her motion for class

26 certification. ECF Nos. 61 and 69. In her motion, Plaintiff sought to certify a class of "All African

27 Americans who applied for and were offered conditional employment as drivers with First Transit at

28 any time since January 23, 2009, and whose applications First Transit rejected because the class

member failed First Transit's criminal background check policy" under Federal Rule of Civil Procedure 23(b)(2) for injunctive and declaratory relief only. *Id*. This class definition and relief sought was significantly narrowed from the definition contained in Plaintiff's Complaint due to information learned through discovery, the intervening *Wal-Mart Stores Inc. v. Dukes*, __ U.S. __, 131 S. Ct. 2541 (2011) decision, and changes First Transit made to its criminal record check ("CRC") policy and procedures after the filing of the Complaint. On July 21, 2011, First Transit served its opposition (ECF No. 71), and on July 28, 2011, Plaintiff served her Reply brief (ECF Nos. 75 and 80).[1]

5. Simultaneous with her motion for class certification, Plaintiff served two expert reports; one by Dr. Bruce Western, a Professor of Sociology at Harvard University, about the racial disparities within the criminal justice system and the attendant economic, including employment, consequences for persons with criminal convictions records, and another by Dr. Thomas DiPrete, a Professor of Sociology at University of Wisconsin – Madison, regarding his statistical analyses of the impact of First Transit's CRC policy on applicants with criminal records, which found statistically significant disparate impact on African American applicants. ECF Nos. 63 and 65. In response, First Transit served with its Opposition, the expert report of Robert Crandall, a Partner at Resolution Economics LLC, which found that (1) First Transit hired African American drivers at rates greater than in its relative labor markets; (2) First Transit driver applicants were not subject to the same background checks practices and procedures nationwide; (3) there were significant variations in criminal fail rates across locations, and (4) when additional controls to Dr. DiPrete's analysis were applied, there was no statistically significant disparities affecting African American driver applicants with criminal convictions. ECF No. 71. Both parties deposed each other's expert about their respective reports and analyses.

---

[1] As compared to the class definition contained in the Complaint, in her motion for class certification Plaintiff did not seek to certify claims on behalf of Latino conditionally hired or incumbent drivers, African American or Latino mechanic and dispatcher applicants or incumbent employees, African American driver incumbent employees; claims under California's Fair Employment and Housing Act, Cal. Gov. Code § 12940(a) or the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*; or class claims for back and front pay, and restitution.

**MANDATORY SETTLEMENT CONFERENCE WITH MAGISTRATE JUDGE SPERO**

6. Due to the extension of the class certification briefing, Plaintiff's motion for class certification was set for hearing on August 11, 2011. However, because the mandatory settlement conference ("MSC") date was not extended, the parties went forward with the August 9, 2011 scheduled MSC before Magistrate Judge Spero. ECF No. 83. This was not Plaintiff's first attempt at settlement. The parties had scheduled a prior settlement conference for June 2, 2010 after the Court granted Plaintiff's unopposed motion for appointment of her counsel as interim Class Counsel (ECF No. 53), but that conference was cancelled once First Transit received Plaintiff's initial settlement proposal. During the August 9, 2011 MSC, Plaintiff and her counsel had frank discussions with Magistrate Judge Spero about the merits of Plaintiff's claims and the challenges facing her with respect to class certification. At the conclusion of that MSC, the parties reached a settlement agreement to settle Plaintiff's individual claims and to dismiss the class claims without prejudice.

7. Throughout the litigation and negotiations leading to the Settlement Agreement, Plaintiff was represented by competent counsel experienced in employment discrimination class actions, who had been appointed interim Class Counsel by this Court. The Settlement Agreement was negotiated at arms length, in good faith, with the assistance of Magistrate Judge Spero, without collusion, and with the best interests of the Plaintiff and putative class members in mind based upon adequate knowledge of all the factual and legal issues. The discovery conducted in this action – the depositions taken by both sides, the documents produced, the experts' analyses, and the other information exchanged – is sufficient to reliably assess the merits of the respective parties' positions and to compromise the issues on a fair and equitable basis.

8. In reaching this conclusion, Plaintiff's Counsel and Plaintiff considered, among other things, the expense, inconvenience, delay, and other demands of continuing, burdensome and protracted litigation, the risks inherent therein, and the benefits provided by the terms of this Settlement Agreement. Despite the narrowing of the class definition and requested relief, First Transit continued to raise several challenges to Plaintiff's ability to certify her defined class, which included (1) the existence of at least two different CRC policies during the relevant class period; (2) the existence of First Transit client contracts that contained varying criminal background checking

3
DECLARATION OF JAMES KAN IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION TO DISMISS PLAINTIFF'S INDIVIDUAL CLAIMS WITH PREJUDICE AND CLASS CLAIMS WITHOUT PREJUDICE AND WITHOUT CLASSWIDE NOTICE - CASE NO.: C10-03158 WHA

289484-3

1  standards; (3) counter-arguments to Plaintiff's expert's disparate impact analyses; (4) counter-

2  arguments that First Transit's current CRC policy matrix could not be considered a single policy; (5)

3  Plaintiff lacked standing to seek injunctive relief and her request for declaratory relief was not ripe

4  because she was terminated under the former CRC policy and First Transit contended that she would

5  be hired under the current CRC policy; and (6) Plaintiff was atypical of the class because she

6  possessed a conviction dismissed pursuant to California Penal Code Section 1203.4.  Furthermore,

7  after the filing of this action, First Transit modified its CRC policy and procedures, and created a

8  Central Background Checking Unit ("CBCU"), a corporate group responsible for ensuring consistent

9  application of First Transit's CRC standards and providing a review and appeals process for the CRC

10  policy.  These changes marked an improvement in First Transit's CRC policies and procedures; though

11  not as extensive as Plaintiff sought.  Plaintiff attempted to obtain further injunctive relief during the

12  MSC, but was unable to persuade First Transit to accept or agree class injunctive relief could legally be

13  mandated.  In the end, given the changed policies and procedures as well as the risks facing Plaintiff's

14  ability to certify the class, the settlement of Plaintiff's individual claim and the dismissal, without

15  prejudice, of the class claims represented the best possible resolution available to Plaintiff and is one

16  that would not harm the class from proceeding with their individual claims.

17  ### CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

18  9.      Because the specific terms and details of the Settlement Agreement are confidential,

19  Plaintiff will be submitting a copy of the Settlement Agreement under seal for the Court's *in camera*

20  review.

21  ### ABSENCE OF EVIDENCE OF PUTATIVE CLASS MEMBER
22  ### RELIANCE ON THIS ACTION

23  10.     After a diligent search of news articles and other media, Plaintiff's Counsel assert that it

24  is highly unlikely that there are putative class members who are aware of and have relied on Plaintiff's

25  discrimination claims on behalf of African American and Latino applicants or incumbent employees

26  who were not hired or were terminated for failing First Transit's CRC policy.  Moreover, any such

27  media coverage of this lawsuit occurred shortly after the lawsuit was filed in trade or business

28  periodicals that putative class members are not likely to have seen or understood the significance of the

1  class action allegations.  Several internet articles are no longer available online.  Attached as Exhibit A

2  are true and correct copies of media coverage my office found regarding this action.

3       11.     An examination of Plaintiff's case files, done at my direction and under my supervision,

4  reveals that Plaintiff's Counsel has not communicated with the overwhelming majority of the putative

5  class members.

6       12.     Plaintiff's Counsel's communications with putative class members was limited to those

7  individuals who were interviewed in support of Plaintiff's discrimination claims or who contacted

8  Plaintiff's Counsel directly.  According to Plaintiff's Counsel's records, 31 putative class members

9  were interviewed by Plaintiff's Counsel.  This total does not include the three (3) individual putative

10  class members represented by Plaintiff's Counsel who have pending EEOC charges against First

11  Transit for similar claims raised by Plaintiff.  Because these individuals have already asserted their

12  individual claims against First Transit, there is no need to provide them with notice.

13       13.     Due to the communication with these 31 putative class members, Plaintiff is willing to

14  communicate separately with these 31 individuals regarding the voluntary dismissal of the class

15  claims.  The parties will reach an agreement upon a form of notice to be sent to these 31 individuals.

16  **LIMITATIONS OF DATA TO IDENTIFY THE PUTATIVE CLASS**

17       14.     After March 2010, First Transit began comprehensively tracking all individuals,

18  applicants and incumbent employees, who were subjected to its CRC policy on a Microsoft Excel

19  Workbook.  Using this document along with First Transit's ADP Payroll database, it is possible to

20  identify the putative class members after March 2010 as well as when their respective hiring claims

21  began to accrue.

22       15.     The filing of Plaintiff's complaint on July 20, 2010, tolled the statute of limitations for

23  all of the ascertainable putative class members terminated after March 2010.  In fact, all of these

24  putative class members whose claims arise after March 2010 have not had a single day of their statute

25  of limitations expired due to the tolling provided by Plaintiff's action.  The putative class members will

26  have 180 or 300 days (depending on the state they are in) from the date their Title VII claims would

27  have arisen to file their action once the Court enters an order dismissing the class claims.  In addition,

28

1   these class members with California claims will have four (4) years to assert their respective state law

2   claims.

3          16.     Prior to March 2010, First Transit did not maintain records with sufficient detail that

4   could identify African American or Latino applicants or employees who were terminated for failing its

5   CRC policy.  For this earlier period of the class period, the limitations in First Transit's applicant data

6   prevents Plaintiff from not only identifying all the members of the putative class, but also from

7   determining when their respective hiring claims accrued.  Consequently, the parties cannot definitively

8   inform the court as to whether many of the absent class members have ample time left on their various

9   statutes of limitations.

10         I declare under the penalty of perjury under the laws of United States and the State of

11  California that the foregoing is correct and accurate.

12         Executed this 16th day of August, 2011 in Oakland, California

14  _____/s/ James Kan_____
    JAMES KAN

**EXHIBIT A**

## Lawsuit against First Transit targets Policy Barring Felons from Employment

Posted on July 21, 2010 | 2 Comments

The Cincinnati Enquirer reports that a fired bus driver, backed by the nation's largest transit unions, filed a class action lawsuit against Cincinnati-based First Transit saying the transit company's policy barring individuals with felony convictions is discriminatory against blacks and Hispanics and violates long-standing civil rights laws.

> Experts say that the case could change hiring practices for all companies nationally whoever prevails, and could set major labor law precedent." First Transit "is a subsidiary of downtown-based First Group America, the nation's largest private provider of transit services for public city bus systems as well as public and private school districts, and also owns Greyhound Bus Lines."

> The First Transit case involves Adrienne Hudson, an African-American single mother from Oakland, Calif. She was hired and then fired from a First Transit job after it was discovered she had an expunged conviction for welfare fraud on her record seven years prior – a conviction she says she took to stay with her children even though her former boyfriend was the actual culprit.

> The Amalgamated Transit Union says that the policy violates the 1964 Civil Rights Act, which states that employers can't base hiring on a past felony conviction if it would disproportionately impact minority groups. Union officials, who support the case, argue that minorities have disproportionately higher criminal records, and therefore such policies are discriminatory.

Share this:    Digg

This entry was posted in National Courts and tagged Civil Rights, Class Action, employment, felons, Workers Rights. Bookmark the permalink.

### 2 RESPONSES TO LAWSUIT AGAINST FIRST TRANSIT TARGETS POLICY BARRING FELONS FROM EMPLOYMENT

**I'll Start** | July 28, 2010 at 11:50 PM | Reply



When will they sue stating that the requirement to speak proper english is inherently racist?

**Whiteysucks** | March 4, 2011 at 7:35 AM | Reply

Discrimination is a vicious circle. Employers refuse to hire or quickly fire minorities at an alarming level. The now unemployed person falls into bad credit due to lack of a job. Unemployed minority continues looking for a job and becomes a victim of credit check discrimination. Of course the credit check was bad because they did not have money for food and housing, so they wrote bad checks or didn't pay bills. Now the minority is incapable of having any job except burger flipping. The minority's child can't get a college loan or a car and whitey looks on with complete satisfaction. That is how discrimination works. America was built on the backs of black people and the land of brown people. Minorities have shed more blood and tears for this country than any caucasian.




awareness. action. impact.

HOME | Use Flash text? Yes | No

**FEATURES**   **VOICES**   **NEWS**   **EVENTS**   **DEPARTMENTS**   **RESOURCES**   **NETWORK**

Search

Industry News

# First Transit Sued for Discrimination Against African-American and Latino Employees and Job Applicants

07-21-2010

SHARE

**July 2011**



ADVERTISEMENT

Virtual Learning Environments
Read about trends, insights and what learning leaders are saying
Download Report Now >>

UNISFAIR

**Oakland, Calif. – July 21**

A class action lawsuit was filed against First Transit Inc., one of the nation's largest bus companies, for illegal discrimination against African-American and Latino employees and job applicants.

The lead plaintiff, Adrienne Hudson, is an African-American woman who was fired in 2009 by First Transit in Oakland after just two days on the job. The legal action is supported by the Amalgamated Transit Union (ATU), the nation's largest union of mass transit workers, and the National Employment Law Project (NELP), a nonprofit organization advocating for employee rights.

At issue is a company-wide policy implemented by First Transit – a subsidiary of British conglomerate FirstGroup plc, which also owns First Student, the nation's largest school bus company, and Greyhound, the nation's largest provider of intercity bus transportation.

First Transit refuses employment to any job applicant who has a past felony conviction or who has been sentenced to any term of incarceration, no matter how brief. The "no-hire" policy is in force regardless of the nature and gravity of the offense, the amount of time passed since the conviction, or whether the offense has any relationship to the job in question.

According to Hudson's complaint, filed today in the U.S. District Court for the Northern District of California, the policy has a "disparate impact" on African-American and Latino job seekers because they are arrested and convicted at far greater rates than their white counterparts.

"More than 13,000 ATU members at 75 locations in the U.S. and Canada work for First Transit or for another company owned by FirstGroup," said ATU International President Ron Heintzman. "If an African-American or Latino worker applies for a job at one of those properties, we expect them to be treated fairly – to have an equal shot at the job, just like anyone else."

First Transit has contracts to provide bus service in major metropolitan areas including Denver, Phoenix, Portland and Vancouver, as well as dozens of smaller contracts in the U.S. and Canada to provide bus, paratransit, university and airport transportation services.

One of Hudson's attorneys, Kalman Resnick of the Chicago law firm Hughes Socol, Piers Resnick & Dym Ltd. added, "When an employer puts in barriers that have nothing to do with the job, that's unfair. And when those barriers affect African-Americans and Latinos more than anyone else, it's more than unfair – it's illegal." Hudson is also represented by NELP attorneys and the Oakland law firm of Goldstein, Demchak, Baller, Borgen & Dardarian.

Policy guidelines of the U.S. Equal Employment Opportunity Commission (EEOC), cited in the class action complaint filed today, support the claim of discriminatory practices at First Transit. According to the EEOC:

"[A]n employer's policy or practice of excluding individuals from employment on the basis of their conviction records has an adverse impact on [African-Americans and Latinos]... such a policy or practice is unlawful under Title VII [of the U.S. Civil Rights Act of 1964] in the absence of a justifying business necessity."

In 2009, Hudson, an experienced and dedicated bus driver skilled at assisting elderly and infirm riders, voluntarily left her employment at a different bus company to join First Transit's Oakland transportation facility as a paratransit driver. Despite her strong work record and experience driving paratransit buses, Hudson was fired after just two days on the job due to a seven-year-old felony welfare fraud conviction, which had been expunged from her record by the state of California.

"This is a person who was convicted many years ago for an offense that is completely unrelated to driving a bus," says ATU International Secretary Treasurer Oscar Owens. "She did everything she was asked to do. She served her sentence, she completed her probation, and her conviction was expunged. Seven years later, she's got a good-paying job, she's supporting her family – and you're going to kick her out on the street and bar her from employment? It doesn't make any sense; we can't let employers get away with that kind of discriminatory behavior."

Hudson has since found employment at another bus company. "Adrienne has a good work record, and it's very clear that her past issues have nothing whatsoever to do with her ability to be a safe and responsible transit operator," said Owens. "She was harmed by First Transit when they fired her after two days on the job, and the evidence will show that First Transit is also discriminating against other African-Americans and Latino employees and job applicants."

"Members of our union believe very strongly in equal opportunity, so we're going to stand together and fight discrimination wherever we find it," said Heintzman.

ADVERTISEMENT

Connect with colleague with just a click

Join the Network today!



ADVERTISEMENT

ADVERTISEMENT

Follow @DiversityExec to stay on top of the latest trends in diversity and inclusion.

ADVERTISEMENT

Follow @DiversityExec to stay on top

0



0


Like

0

Share

 Email
Print

# No-felon hiring policy may violate civil rights

by Vanessa Price on July 30, 2010

In Oakland, CA, a woman is taking First Transit Bus Company to court in a federal class action lawsuit. Her grounds for the case are based on the company's policy of not hiring felons, which she says is blatant discrimination against blacks and Latinos. According to Ms. Adrienne Hudson, the no-felon policy violates fair employment laws and civil rights.

The Plaintiff, Adrienne Hudson was employed by First Transit in 2009 where she worked out of their Oakland office. After 3 weeks of training, and 2 days on the job driving a city bus, her background check came through and she was fired for a 7 year old welfare fraud conviction, which was later dismissed.

Hudson says she was forthright about her history in her interview and HR assured her it would not be a problem. Her suit seeks elimination of the hiring practice, and monetary damages.

The largest transit union in the United States, Amalgamated Transit Union, is backing Hudson's complaint along with the National Employment Law Project, a non-profit organization advocating for employee rights. The union argues that any employment disqualification policies based on incarceration history are biased against minorities because of the higher national incarceration rate of certain people groups. The Union states that criminal background checks as part of the employment process "have a disparate impact on African-American and Latino job applicants…"

ATU's secretary-treasurer, Oscar Owens said of the case, "This is a person who was convicted many years ago for an offense that is completely unrelated to driving a bus."

Hudson's attorney, Kalman Resnick said, "This kind of a ban, which doesn't take into consideration the length of time since the offense, or whether the offense is related to the job at hand – such as vehicular manslaughter for a job as a bus driver – but rather bans anyone who has ever spent a day in jail on a conviction for anything, not only affects that individual, but has societal implications." Resnick continued, "This can continually depress a class of people who could get better pay and work their way out of poverty."

(Visited 344 times, 22 visits today)

Email Print

**Have an interesting story to tell?**
Submit it and you may win an iPad!

{ 1 comment }

 Charles Grays
September 8, 2010 at 6:32 pm

I do agree if the crime is not related to the job at hand. I do have a related story about a transit company that I work for for 15 yr's and I quit to learn how to drive trucks. I had got hurt on the trucking job and 2 yr's later I reapplied at this transit company and was denied employment becuase of my pass criminal background. In 1982 I was convicted of robbery. In 1993 I applied at transit and I was hire. In 2008 I quit driving buses. After 15 yr's Plus working for transit as a supervisor, dispatcher, who count money for the company and also a driver. Over the 15 yr's I had no work related problems. Over the 15 yr's I have proven to be a employee of trust. In Aug 2010 I reapplied for employment at transit and I took a drug test and was schedule for a physical which was cancel after they comfirm my criminal background. I was denied employment base upon my criminal background only and not my pass work history with the company over the 15 yr's of service I gave to the company.



- **Search**

  [                    ]

- **Categories**

  - Benefits (12)
  - Compensation (13)
  - Department of Labor (45)
  - Diversity (10)
  - Economy (134)
  - Immigration (9)
  - International (15)
  - Labor laws (38)
  - Layoffs (71)
  - Recession (71)
  - Recruiting (147)
  - Retention (13)
  - Talent management (11)
  - Uncategorized (15)
  - Unemployment (29)
  - Work-life balance (5)

- **Jobs**

  what
  [                    ]
  job title, keywords

  where
  [                    ]
  city, state or zip

  [ Find Jobs ]
  job search by
  JustJobs.com

WordPress Admin

 **chron** | National

NEWS   SPORTS   BUSINESS   ENTERTAINMENT   LIFE   TRAVEL   BLOGS   JOBS   HOMES   CARS   CLASSIFIEDS

Facebook   Twitte

🌐 0 Comments    Recommend 83

Search          advanced search | archive:
⦿ Chron.com  ○ Web Search by  ○ Businesses
                YAHOO!                   GO

# Some job-screening tactics challenged as illegal

By SAM HANANEL, ASSOCIATED PRESS WRITER
Aug. 11, 2010, 5:29PM

**Share**

- Del.icio.us
- Twitter
- StumbleUpon
- Digg
- Facebook
- Email

Recommend   83 people recommend this.
Be the first of your friends.

WASHINGTON — Companies using criminal records or bad credit reports to screen out job applicants might run afoul of anti-discrimination laws as the government steps up scrutiny of hiring policies that can hurt blacks and Hispanics.

A blanket refusal to hire workers based on criminal records or credit problems can be illegal if it has a disparate impact on racial minorities, according to the Equal Employment Opportunity Commission. The agency enforces the nation's employment discrimination laws.

"Our sense is that the problem is snowballing because of the technology allowing these checks to be done with a fair amount of ease," said Carol Miaskoff, assistant legal counsel at the EEOC.



**Post a Job.**
Limited time only!
Save up to 27%
on Select Job Postings
Save Now  monster.com

With millions of adults having criminal records — anything from underage drinking to homicide — a growing number of job seekers are having a rough time finding work. And more companies are trying to screen out people with bankruptcies, court judgments or other credit problems just as those numbers have swollen during the recession.

Just ask Adrienne Hudson, a single mother who says she was fired from her new job as a bus driver at First Transit in Oakland, Calif., when the company found out she had been convicted seven years earlier for welfare fraud.

Hudson, 44, is fighting back with a lawsuit alleging the company's hiring practice discriminates against black and Latino job seekers, who have arrest and conviction rates far greater than whites. A spokesman for First Transit said the company does not comment on pending litigation.

"People make mistakes," said Hudson, who is black, "but when they correct their mistake, they should not be punished again outside of the court system."

Justice Department statistics show that 38 percent of the U.S. prison population is black, compared with about 12 percent of the general population. In 2008, African-Americans were about six times more likely to be incarcerated than whites. The incarceration rate for Latinos was 2.3 times higher than whites.

If criminal histories are taken into account, the EEOC says employers must also consider the nature of the job, the seriousness of the offense and how long ago it occurred. For example, it may make sense to disqualify a bank employee with a past conviction for embezzlement, but not necessarily for a DUI.

Most companies tend to be more nuanced when they look at credit reports, weeding out those applicants with bad credit only if they seek senior positions or jobs dealing with money. But if the screening process weeds out more black and Hispanic applicants than whites, an employer needs to show how the credit information is related to the job.

About 73 percent of major employers report that they always check on applicants' criminal records, while 19 percent do so for select job candidates, according to a 2010 survey by the Society for Human Resource Management.

The same survey found that almost half of major companies conduct credit checks for some job candidates, such as those who would be in a position of financial trust. Another 13 percent perform credit checks for all potential workers.

Last fall, the EEOC sent a strong message to employers when it filed a class-action lawsuit against Freeman Companies, a Dallas-based events planning firm, alleging the company discriminated against blacks, Hispanics and males by rejecting job seekers based on credit history and criminal records. Freeman has denied the charges.

The growth of online databases and a multimillion dollar background check industry have made it easy for employers to find out reams of information about potential hires. Companies see the checks as another way to weed out unsavory candidates, keep a safe work environment and prevent negligent hiring claims.

"Past indiscretions may be an indicator of future behavior, especially in the criminal context," said Pamela Devata, a Chicago employment lawyer who has represented companies trying to comply with EEOC's requirements.

Devata said employers nationwide have seen the EEOC become more active in investigating employer hiring practices. The scrutiny has caused many companies to reevaluate their screening process and move to a case-by-case standard.

Ariela Migdal, an attorney with the American Civil Liberties Union's Women's Rights Project in New York, said a person might have a blemish that has nothing to do with the job he or she is seeking. And records sometimes are inaccurate or not updated to reflect that someone arrested later had charges dropped or a conviction overturned or expunged, she said.

"Somebody with an old conviction that has been rehabilitated doesn't have any greater likelihood of committing a crime, so it's irrational to use that against them," Migdal said.

Ron Heintzman, president of the Amalgamated Transit Union, said he's seen dozens of job candidates disqualified

Ex-Miss El Paso apologizes after alleged shoplifting incident

Justice: To save face, A&M must head to SEC

Landscaper in Pearland first heat victim in Harris County

Searchers look for possible drowning victim in Brazos River

Authorities seek clues in north Harris Co. death of 30-year-old

Perry to announce for president Saturday in South Carolina(529)

Perry expected to 'shake up' 2012 race(477)

Justice: To save face, A&M must head to SEC(233)

7 tied to MS-13 gang accused of murders here(219)

N.Y. Post: 'Drunk' teen on jet, an Olympic hopeful, pees on girl(135)

A show of strength after 9/11, Freedom Tower will stand tall

GOP debate: Hitting hard at each other _ and Obama

Obama: Something is wrong with country's politics

DA: Police officer shot in eastern Pa. has died

New face of chimpanzee attack victim revealed

iPads trump oil: Apple is most valuable US company

California detective testifies in gay student murder trial

"for reasons that were just ridiculous." His union, with 13,000 members in First Transit, is paying for the lawsuit that Hudson filed last month against the company which operates bus service in Oakland and several other major cities.

In Hudson's case, she was fired after just two days on the job as a bus driver because of a 7-year-old felony welfare fraud conviction. The conviction was later dismissed under California law, but her lawsuit, filed in federal court last month, claims the company has a policy to deny employment no matter how old the conviction, the applicant's prior work history or whether it is related to the job.

## More from Chron.com:

Powered by spot











SPONSORED

**Cowboys WR coach Robinson OK after scary collision**

**Texans notes: Home sweet home for new signings**

**Houston mom gets 40 years in death of baby daughter**

**Heisman winner says he lost $2 million in Texan's scam**

**The One Airport to Avoid Is...**
The Wall Street Journal.

### More from Around the Web:

Ex-Braves pitcher, actress face Wyo. foreclosures
8/6/2011 ? MySA

Ballmer: Windows Phone 7 sales ?very small?
7/12/2011 ? Business Heds Index

Teen buried on Calif. beach thought he would die
8/4/2011 ? San Francisco Bay Area and California Business News ? ? SFGate

Bachmann points to foster parenting _ on her terms
8/11/2011 ? San Francisco Bay Area and California Business News ? ? SFGate

EU APNewsAlert
8/11/2011 ? San Francisco Bay Area and California Business News ? ? SFGate



**Banks Forced to Forgive Credit Card Debt**
Find Out If You Qualify for Debt Settlement!



**Mortgage Rates Hit 2.75%**
If you owe under $729k you probably qualify for 3.1% APR...

ADVERTISEMENT

## Add Your Comment

**New to the site?**

To use commenting, you need to sign up.

[Sign up]

**Already a member?**

Please log in. **Forgot Password?**

| | |
|---|---|
| **Email** | |
| **Password** | |

☐ Remember Me     [Log in]

**Low Cost Bail Bondsmen**
Get Fast, Cheap Bail - Search here
yellowpages.com

**Money Market Accts (MMAs)**
Find the highest yields in the US Plus
www.bankrate.com

**Mortgage Rate at 2.37%**
Get the Best Mortgage Rates.
Mortgage.LeadSteps.com

**$79/HR Job - 476 Openings**
Make $79/hr Working From Home.
www.selectonlinejobs.com/

Ads by Yahoo!

**CHRON**

Home
Houston & Texas
Nation
Business
Sports
Entertainment
Life
Travel
Corrections
Blogs

Weather
Chron Commons
Traffic

**TOPICS**

Small Business
PetsHouston
MomHouston
HoustonBelief
Gardening
29-95

**NEIGHBORHOODS**

Aldine
Alief
Baytown
Bellaire
Clear Lake
Conroe
Cy-Fair
East End
Fort Bend
Heights
Katy

Kingwood
Lake Houston
Magnolia
Memorial
Montrose
Pasadena
Pearland
Spring
Tomball
West U
The Woodlands

**MARKETPLACE**

Find Houston jobs
Homes
Cars
Classifieds
Place a classified ad
Contests

**SERVICES**

Help
Business directory
Legal notices
Contact us
Send us tips
About the company
Employment
opportunities
Place a Retail Ad
Advertising Services

**MEMBERSHIP**

Sign up
Log in

**OTHER EDITIONS**

Home delivery
Mobile
RSS feeds
Chronicle in Education
e-Edition
Breaking news alerts

**LOCAL SERVICES**

Houston Attorneys      Houston Salons      Houston HVAC Contractors



Privacy statement | Terms of service | About Our Ads
Copyright © 2011 The Houston Chronicle

**H E A R S T** *newspapers*

# Some job-screening tactics challenged as illegal

Recommend
0

Share

Below:   Discussion   Data   Related

Use of credit reports, crime records may impact minorities more heavily

By
**SAM HANANEL**

_AP_ Associated Press

updated 8/12/2010 7:52:04 AM ET



Adrienne Hudson is photographed at the law office of Go
in Oakland, Calif., in this photo taken Tuesday, July 20, 2
from her new job as a bus driver at First Transit in Oaklar
been convicted seven years earlier for welfare fraud. (AI

WASHINGTON — Companies using criminal records or bad credit reports to screen out job
applicants might land afoul of anti-discrimination laws as the government steps up scrutiny of
hiring policies that can hurt blacks and Hispanics.

A blanket refusal to hire workers based on criminal records or credit problems can be illegal if
it has a disparate impact on racial minorities, according to the Equal Employment Opportunity
Commission. The agency enforces the nation's employment discrimination laws.

"Our sense is that the problem is snowballing because of the technology allowing these checks
to be done with a fair amount of ease," said Carol Miaskoff, assistant legal counsel at the
EEOC.

With millions of adults having criminal records — anything from underage drinking to
homicide — a growing number of job seekers are having a rough time finding work. And more
companies are trying to screen out people with bankruptcies, court judgments or other credit
problems just as those numbers have swollen during the recession.

Just ask Adrienne Hudson, a single mother who says she was fired from her new job as a bus
driver at First Transit in Oakland, Calif., when the company found out she had been convicted
seven years earlier for welfare fraud.

Hudson, 44, is fighting back with a lawsuit alleging the company's hiring practice
discriminates against black and Latino job seekers, who have arrest and conviction rates far
greater than whites. A spokesman for First Transit said the company does not comment on
pending litigation.

"People make mistakes," said Hudson, who is black, "but when they correct their mistake, they should not be
punished again outside of the court system."

Justice Department statistics show that 38 percent of the U.S. prison population is black, compared to about 12
percent of the general population. In 2008, African Americans were about six times more likely to be incarcerated
than whites. The incarceration rate for Latinos was 2.3 times higher than whites.

If criminal histories are taken into account, the EEOC says employers must also consider the nature of the job, the
seriousness of the offense and how long ago it occurred. For example, it may make sense to disqualify a bank
employee with a past conviction for embezzlement, but not necessarily for a DUI.

Most companies tend to be more nuanced when they look at credit reports, weeding out those applicants with bad credit only if they seek senior
positions or jobs dealing with money. But if the screening process weeds out more black and Hispanic applicants than whites, an employer
needs to show how the credit information is related to the job.

About 73 percent of major employers report that they always check on applicants' criminal records, while 19 percent do so for select job
candidates, according to a 2010 survey by the Society for Human Resource Management.

The same survey found that almost half of major companies conduct credit checks for some job candidates, such as those who would be in a
position of financial trust. Another 13 percent perform credit checks for all potential workers.

Last fall, the EEOC sent a strong message to employers when it filed a class-action lawsuit against Freeman Companies, a Dallas-based events
planning firm, alleging the company discriminated against blacks, Hispanics and males by rejecting job seekers based on credit history and

Major Market Indic

Index

NASDAQ

S&P 500

DJIA

Symbol or name

criminal records. Freeman has denied the charges.

The growth of online databases and a multimillion dollar background check industry have made it easy for employers to find out reams of information about potential hires. Companies see the checks as another way to weed out unsavory candidates, keep a safe work environment and prevent negligent hiring claims.

"Past indiscretions may be an indicator of future behavior, especially in the criminal context," said Pamela Devata, a Chicago employment lawyer who has represented companies trying to comply with EEOC's requirements.

Devata said employers nationwide have seen the EEOC become more active in investigating employer hiring practices. The scrutiny has caused many companies to reevaluate their screening process and move to a case-by-case standard.

Ariela Migdal, an attorney with the American Civil Liberty Union's Women's Rights Project in New York, said a person might have a blemish that has nothing to do with the job he or she is seeking. And records sometimes are inaccurate or not updated to reflect that someone arrested later had charges dropped or a conviction overturned or expunged, she said.

"Somebody with an old conviction that has been rehabilitated doesn't have any greater likelihood of committing a crime, so its irrational to use that against them," Migdal said.

Ron Heintzman, president of the Amalgamated Transit Union, said he's seen dozens of job candidates disqualified "for reasons that were just ridiculous." His 13,000-member union is paying for the lawsuit that Hudson filed last month against First Transit, which operates bus service in Oakland and several other major cities.

In Hudson's case, she was fired after just two days on the job as a bus driver because of a 7-year-old felony welfare fraud conviction. The conviction was later dismissed under California law, but her lawsuit, filed in federal court last month, claims the company has a policy to deny employment no matter how old the conviction, the applicant's prior work history or whether it is related to the job.

Copyright 2010 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

0          0          Recommend      Be the first of your friends to recommend this.      Share

## Most popular on msnbc.com

Search msnbc                bing [Search]

| Categories | Trending | | | Views | Top videos |
|---|---|---|---|---|---|

All

US & World

Politics

Business                     Loading popular content ...

Sports

Entertainment

Health

Tech & science

Travel


**For Release:** August 13, 2010
**Contact:** David Almasi at (202) 543-4110 x11 or (703) 568-4727 or dalmasi@nationalcenter.org or or Judy Kent at (703) 759-7476 or jkent@nationalcenter.org

### Convicts as a Protected Class?

### EEOC Thinks Background Checks Can Discriminate Against Blacks, Hispanics

*Washington, DC* - Attorneys at the federal Equal Employment Opportunity Commission (EEOC) believe new technology that makes it easier for employers to check the criminal and credit histories of applicants is also makes it harder for blacks and Hispanics to find jobs. Members of the Project 21 black leadership network fault this position, noting that it unjustly interferes with the ability of employers to build a trusted and coherent workforce.

"Background and credit checks are legitimate hiring and recruitment tools," said Project 21 member Horace Cooper, a former visiting assistant professor of law at the George Mason University School of Law. "There is no federal law making a refusal to hire convicted felons a crime, and felon status is not a protected class under Title VII of the Civil Rights Act. Especially in the midst of a recession, suits like these -- which charge racial discrimination -- falsely serve to only make hiring decisions unnecessarily harder and lessen the impact of real allegations of racism."

Adrienne Hudson filed a lawsuit against First Transit after she was fired from a bus driver position with the company. She alleges her firing was due to her prior conviction for welfare fraud, and that First Transit discriminates against blacks and Hispanics when it does background checks because these minority groups have higher rates of arrest and convictions than whites. First Transit representatives would not comment.

The AP reports the EEOC believes background checks can have a disparate impact on blacks and Hispanics, and quotes EEOC assistant legal counsel Carol Miaskoff saying "the problem is snowballing because of the technology" that is making it easier to do such checks.

Last fall, the EEOC filed a class-action lawsuit against the Freeman Companies event-planning company that claimed the company's background checks discriminated against blacks, Hispanics and men.

"Once again, the liberal legal theory of 'disparate impact' is trotted out. This time, it is by the bean-counters at EEOC. They are now arguing that if an employer conducts background checks on employees they are, in effect, discriminating against black and Latino applicants. But shouldn't employers have the right to set standards for those they seek to employ and reject those who have criminal records?" said Project 21 member Joe Hicks, host of "The Hicks File" at PJTV.com. "Americans strongly believe in the concept of redemption, but there must be consequences for illegal behavior. To claim otherwise suggests that employers should ignore employment standards and simply hire people based on some ideological concept of 'social justice.' The notion that criminal background checks disadvantage blacks and Latinos is based in the reality that blacks are 38 percent of the prison population but only 12 percent of the general population. This shouldn't be used as an argument for eliminating employment standards, but a reason to understand and combat the dysfunction and violent criminality that's an all-too-real part of poor black urban life.

Project 21, a leading voice of black conservatives since 1992, is sponsored by the National Center for Public Policy Research (http://www.nationalcenter.org).

-30-

Consider a tax-deductible donation

- Home
- About
- Activism/Initiatives
- Contact Us
- Mission Statement
- [                    ] Search

# A Blog of the African Diaspora

**Feeds:**
   Posts
   Comments

« sat'day riddymz
A Move Towards Religious Tolerance »

# Convicts as a Protected Class

August 15, 2010 by asabagna

    Rate This

**Federal Agency Thinks Background Checks Can Discriminate Against Blacks, Hispanics**

*Op-ed submission by **Project 21***

Washington, D.C. – Attorneys at the federal Equal Employment Opportunity Commission believe new technology that makes it easier for employers to check the criminal and credit histories of applicants is also makes it harder for blacks and Hispanics to find jobs. Members of the Project 21 black leadership network fault this position, noting that it unjustly interferes with the ability of employers to build a trusted and coherent workforce.

*"Background and credit checks are legitimate hiring and recruitment tools,"* said Project 21 member Horace Cooper, a former visiting assistant professor of law at the George Mason University School of Law. *"There is no federal law making a refusal to hire convicted felons a crime, and felon status is not a protected class under Title VII of the Civil Rights Act. Especially in the midst of a recession, suits like these — which charge racial discrimination — falsely serve to only make hiring decisions unnecessarily harder and lessen the impact of real allegations of racism."*

Adrienne Hudson filed a lawsuit against First Transit after she was fired from a bus driver position with the company. She alleges her firing was due to her prior conviction for welfare fraud, and that First Transit discriminates against blacks and Hispanics when it does background checks because these minority groups have higher rates of arrest and convictions than whites. First Transit representatives would not comment.

The AP reports the EEOC believes background checks can have a disparate impact on blacks and Hispanics, and quotes EEOC assistant legal counsel Carol Miaskoff saying

*"the problem is snowballing because of the technology"* that is making it easier to do such checks.

Last fall, the EEOC filed a class-action lawsuit against the Freeman Companies event-planning company that claimed the company's background checks discriminated against blacks, Hispanics and men.

*"Once again, the liberal legal theory of 'disparate impact' is trotted out. This time, it is by the bean-counters at EEOC. They are now arguing that if an employer conducts background checks on employees they are, in effect, discriminating against black and Latino applicants. But shouldn't employers have the right to set standards for those they seek to employ and reject those who have criminal records?"* said Project 21 member Joe Hicks, host of **"The Hicks File"** at PJTV.com *"Americans strongly believe in the concept of redemption, but there must be consequences for illegal behavior. To claim otherwise suggests that employers should ignore employment standards and simply hire people based on some ideological concept of 'social justice.' The notion that criminal background checks disadvantage blacks and Latinos is based in the reality that blacks are 38 percent of the prison population but only 12 percent of the general population. This shouldn't be used as an argument for eliminating employment standards, but a reason to understand and combat the dysfunction and violent criminality that's an all-too-real part of poor black urban life."*

***Project 21, a nonprofit and nonpartisan organization sponsored by the National Center for Public Policy Research, has been a leading voice of the African-American community since 1992.***

**Share this:** | StumbleUpon | Digg | Reddit

**Like this:** | Like | Be the first to like this post.

Posted in African-Americans, AfroSpear, AfroSphere, Criminal Justice, discrimination in the workplace, Employment, Project 21, Racism, Work | 8 Comments

## 8 Responses



1. on *August 15, 2010 at 5:09 pm* | *Reply*  Anna Renee
   0    0    Rate This

   "Project 21, a nonprofit and nonpartisan organization sponsored by the National Center for Public Policy Research, has been a leading voice of the African-American community since 1992."

   This is just vicious, Asa. 😊

   

   ○ on *August 15, 2010 at 5:31 pm* | *Reply*  asabagna


**August 12, 2011**

Member Resources

Member Home

RTD

First Transit

Veolia

Retirees

Contract questionnaire

News and Bulletins

Links

RTD Board of Directors

Officers & Staff

Events Calendar

Message Board

Classified Ads

Contracts

Const./Bylaws

Endorsements

Login

**Important Links**

Driver's Information

RTD home page

ATU International

Health and Welfare trust

# First Transit hiring practice lawsuit

Updated On: Dec 21, 2010

SHARE

### First Transit faces suit over hiring policies

## By James Pilcher jpilcher@enquirer.com July 20, 2010

Backed by the nation's largest transit unions, a fired bus driver from Oakland, Calif. Tuesday filed a class action lawsuit against downtown Cincinnati-based First Transit, saying the transit company's policy barring individuals with felony convictions is discriminatory against blacks and Hispanics and violates long-standing civil rights laws.

Experts say that the case could change hiring practices for all companies nationally whoever prevails, and could set major labor law precedent.

"It would be enormously significant and could eventually say to all companies in the country, in Ohio and in Cincinnati that these blanket felon bans and their restrictions are unacceptable," said Stephen JohnsonGrove, a lawyer with the downtown-based Ohio Justice and Policy Center, a non-profit law agency that works on labor and civil rights issues regionally and statewide.

First Transit is a subsidiary of downtown-based First Group America, the nation's largest private provider of transit services for public city bus systems as well as public and private school districts, and also owns Greyhound Bus Lines. First Transit specifically handles public transit systems.

The filing joins a handful of similar suits over the last few years, including one filed earlier this year against the U.S. Census Bureau.

The First Transit case involves Adrienne Hudson, an African-American single mother from Oakland, Calif. She was hired and then fired from a First Transit job after it was discovered she had an expunged conviction for welfare fraud on her record seven years prior - a conviction she says she took to stay with her children even though her former boyfriend was the actual culprit.

The Amalgamated Transit Union says that the policy violates the 1964 Civil Rights Act, which states that employers can't base hiring on a past felony conviction if it would disproportionately impact minority groups. Union officials, who support the case, argue that minorities have disproportionately higher criminal records, and therefore such policies are discriminatory.

"We discovered that the company was taking over other contracts and letting people go, even though federal law requires the new subcontractor to keep the previous hiring policies in place," said Ronald Heintzman, president of the Washington-based Amalgamated Transit Union, which has 190,000 members nationally - including 13,000 at First Transit. "And that led to a pattern of discriminating against blacks and

**Member Login**

Username:

Password:

Login
Not registered yet?
Click Here to sign-up

Forgot Your Login?

<<    **August 2011**

| S | M | T | W | T | F |
|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 |
| 7 | 8 | 9 | 10 | 11 | 12 |
| 14 | 15 | 16 | 17 | 18 | 19 |
| 21 | 22 | 23 | 24 | 25 | 26 |
| 28 | 29 | 30 | 31 | | |

**Site Search**

Search  Site Map

RSS Feeds

**ATU**

Connection Failure: Thi
usually happens when
news feed URL is enter
incorrectly.

**ATU News**

Connection Failure: Thi
usually happens when
news feed URL is enter
incorrectly.

Hispanics for both existing workers as well as new hires."

## Class action suit claims employment discrimination by bus company

By Angela Hill
Oakland Tribune
Posted: 07/20/2010 02:58:40 PM PDT

OAKLAND -- An Oakland woman is the lead plaintiff in a federal class action lawsuit against the Ohio-based First Transit bus company, one of several service providers for East Bay Paratransit, claiming the company's hiring policy barring applicants with felony convictions is discriminatory against blacks and Latinos and violates civil rights and fair employment laws.

The complaint, filed Tuesday in U.S District Court in San Francisco on behalf of 44-year-old Adrienne Hudson, is backed by the nation's largest transit unions. It asserts that, because blacks and Latinos have a higher incarceration rate nationally, employment-selection policies based on criminal background checks -- such as First Transit's -- have "a disparate impact on African-American and Latino job applicants and employees."

Officials with the Amalgamated Transit Union, the nation's largest union of mass transit workers, say the policy violates the 1964 Civil Rights Act which states employers can't base hiring on a past felony conviction if it would disproportionately impact minority groups.

In Hudson's case, "This is a person who was convicted many years ago for an offense that is completely unrelated to driving a bus," said Oscar Owens, ATU secretary-treasurer. "She did everything she was asked to do. She served her sentence, she completed her probation, and her conviction was expunged. Seven years later, she's got a good-paying job, she's supporting her family, and you're going to kick her out on the street and bar her from employment? We can't let employers get away with that kind of discriminatory behavior."

---

ATU local 1001
Copyright © 2011, All Rights Reserved.
Powered By UnionActive™

57592 visitors since May 26, 2010





**National Employment
Law Project**

Delivering Economic Opportunity

July 26, 2011

Ms. Jacqueline Berrien, Chair
Equal Employment Opportunity Commission
131 M Street, N.E.
Washington, DC 20507

Mr. Stuart Ishimaru, Commissioner
Equal Employment Opportunity Commission
131 M Street, N.E.
Washington, DC 20507

Ms. Constance Barker, Commissioner
Equal Employment Opportunity Commission
131 M Street, N.E.
Washington, DC 20507

Ms. Chai Feldblum, Commissioner
Equal Employment Opportunity Commission
131 M Street, N.E.
Washington, DC 20507

Ms. Victoria Lipnic, Commissioner
Equal Employment Opportunity Commission
131 M Street, N.E.
Washington, DC 20507

Re:    EEOC Enforcement of Title VII Protections Regulating Criminal Background Checks

Dear Chair Berrien and Commissioners Ishimaru, Barker, Feldblum, and Lipnic:

Thank you for convening the EEOC Commissioners' meeting on the critical issue of Title VII violations
resulting from criminal background checks for employment. The July 26th forum provides a timely
opportunity to evaluate the new realities of criminal background checks for employment. We urge
the EEOC to take the next step and update its guidances and enforcement strategies regulating
criminal background checks, balancing the civil rights of workers of color and the legitimate concerns
of employers to protect safety and security on the job.

Our organization, the National Employment Law Project (NELP), promotes more fair and accurate
criminal background checks to help reduce barriers to employment of people with a criminal record.
NELP represents workers to enforce the civil rights and consumer protections that apply to criminal
background checks. NELP also advocates for model policy reforms at the federal, state and local
levels. Attached to this letter, we have provided summaries of some of the compelling stories of
workers struggling to find employment with a criminal record, often after an isolated run-in with the
law in their youth that followed them for the rest of their adult working lives.

National Office
75 Maiden Lane, Suite 601
New York, NY 10038
(212) 285-3025  tel
(212) 285-3044  fax
nelp@nelp.org   www.nelp.org

Washington, DC Office
1620 Eye Street NW, Suite 210
Washington, DC 20006
(202) 887-8202  tel
(202) 785-8949  fax

California Office
405 14th Street, Suite 1400
Oakland, CA 94612
(510) 663-5700  tel
(510) 663-2028  fax

Midwest Office
3131 South State Street, Suite 302
Ann Arbor, MI 48108
(734) 369-5616  tel
(866) 373-8994  fax

West Coast Office
1225 S. Weller Street, Suite 205
Seattle, WA 98144
(206) 324-4000  tel
(866) 682-5467  fax

NELP recently released a report (*65 Million "Need Not Apply:" The Case for Reforming Criminal Background Checks for Employment*) documenting the major barriers to employment faced by the 65 million (or nearly one in four) U.S. adults with a criminal record and the widespread use of blanket employer restrictions denying employment to people with a criminal record. In addition, the report describes the severe impact of criminal background checks on communities of color. For example, in 2009, the number of arrests as a percentage of the population was just over three percent for whites compared to 7.6 percent for African Americans. African Americans are also about four times more likely to have a felony conviction.

The obstacles to employment posed by criminal record background checks take on special significance in light of the severe economic downturn and the shrinking employment opportunities of people of color. According to a recent U.S. Department of Labor report, *The Black Labor Force in Recovery*, "[t]he average unemployment rate for blacks in 2010 was 16.0 percent, compared to 8.7 percent for whites, and 12.5 percent for Hispanics." Thus, as our nation's workers continue to struggle to find jobs, criminal background checks compound the historic employment challenges of the African American and Latino communities. What's more, according to the Society of Human Resources Management, over 90 percent of companies reported using criminal background checks for their hiring decisions, which is up from 51 percent in 1996. (Evren Esen, *SHRM Workplace Violence Study* (Society for Human Resource Management, January 2004) at 19).

Recognizing the devastating impact of these trends on public safety, policy makers across the U.S. have taken significant steps to reduce barriers to employment of people with criminal records. For example, Attorney General Eric Holder recently convened the Federal Interagency Reentry Council, which is coordinating a federal response to the record numbers of people returning home from prison, seeking work and a new way of life. In addition, over two dozen cities and five states have adopted "ban the box" policies and other model hiring reforms. Massachusetts recently implemented the broadest law in the nation, applying these innovative hiring procedures to all public and private employers. (Chapter 256 of the Acts of 2010).

However, private and public sector employers have a long way to go to eliminate discrimination against people of color based on a criminal background check. As documented in our recent report, many private employers continue to utilize blanket prohibitions that exclude anyone with a prior criminal record from employment, which disproportionately deprive African Americans and Latinos of employment opportunities for which they are otherwise qualified. As a result, large numbers of charges of discrimination have been filed with the EEOC alleging race and national origin discrimination because of employers' criminal records hiring policies, and seven major Title VII lawsuits are pending in the courts on the issue. (See attachment). In addition, NELP recently filed several Title VI complaints with the U.S. Department of Labor against federally-funded job training programs that post job ads containing blanket hiring restrictions.

Cumulatively, these developments reinforce the significant opportunity now before the EEOC to take stock of the issue and update its policies and enforcement strategies. Nearly 25 years ago, the EEOC recognized the disparate impact that criminal background checks have on workers of color protected against employment discrimination by Title VII of the Civil Rights Act of 1964. In 1987, the EEOC made clear that "an employer's policy or practice of excluding individuals from employment on the

basis of their conviction records has an adverse impact on Blacks and Hispanics in light of statistics showing that they are convicted at a rate disproportionately greater than their representation in the population." (Policy Statement on the Issue of Conviction Records Under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e et seq. (1982) (Feb. 4, 1987)).

Because of this adverse impact, the EEOC concluded that "such a policy or practice is unlawful under Title VII in the absence of a justifying business necessity." Id. Again, in 1990, the EEOC announced that "[d]ue to this adverse impact, an employer may not base an employment decision on the conviction record of an applicant or employee absent business necessity." (Policy Guidance on the Consideration of Arrest Records in Employment Decisions under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (1982) (Sept. 7, 1990)). In addition, criminal background checks potentially impact workers protected by the Americans with Disabilities Act. Specifically, criminal background checks may work to "screen out" recovered substance abusers whose convictions were a result of their addictions, potentially violating the ADA. (42 U.S.C. § 12112(b)(6)).

The standards adopted by the EEOC properly balance the civil rights of workers and the safety and security needs of the employer community, as employers are simply obligated to take into account reasonable factors, including the age and seriousness of an offense its relation to the specific job at issue. Indeed, the latest research provides strong support for the EEOC's standards, while calling into question blanket policies denying employment to people with a criminal record. According to a major study by one of the nation's leading criminologists, Professor Alfred Blumstein of Carnegie Melon University, in less than seven years most criminal records no longer predict whether an individual is a safety or security threat on the job. (Blumstein, Alfred & Kiminori Nakamura, "Redemption" in an Era of Widespread Criminal Background Checks, National Institute of Justice Journal, Issue No. 263 (June 2009)).

In his study of people with felony conviction records in New York State, Professor Blumstein found that after 3.8 years have passed, a person convicted of felony burglary was no more likely than the average person in the general public to be re-arrested (for aggravated assault it was 4.3 years, and for robbery it was 7.7 years). Importantly, Professor Blumstein's subjects were initially arrested at 18. If the subject was initially arrested merely two years later at age 20, it takes the person three fewer years to have the same arrest rate as the general population. Thus, Professor Blumstein convincingly concluded that, within a narrow period of time, an individual's "criminal record empirically may be shown to be irrelevant as a factor in a hiring decision."

The plight of U.S. workers and with a criminal record has reached crisis proportions, especially given the severe economic downturn and the vast expansion of criminal background checks for employment. However, the EEOC guidelines regulating the issue date back over two decades. More than any other federal agency, the EEOC is now in a position to effectively respond to this national crisis, building on the guidelines established in 1987. By doing so, the agency will providing necessary direction and support to the courts, to the employer community, to the private screening firms, to public employers at all levels of government, and to workers struggling to support their families and their communities hard hit by unemployment.

3

Building on the July 26th forum, we therefore urge the EEOC to update the guidelines that apply to the use of arrest and conviction information, aggressively enforce the law and expand its education and outreach to the employer and worker communities. Thank you for your attention to this issue of critical importance to millions of Americans struggling to find work in today's economy.

Sincerely,

Maurice Emsellem
Policy Co-Director

Madeline Neighly
Staff Attorney

Encls.



**Current Title VII Criminal Records Lawsuits**
- *EEOC v. Freeman* (D. Md., filed Sept. 30, 2009)
- *Mays v. Burlington Northern Santa Fe Railroad Co.* (N.D. Ill., filed Jan. 11, 2010)
- *Arroyo v. Accenture* (S.D.N.Y., filed April 8, 2010)
- *Johnson et al. v. Locke* (S.D.N.Y., filed April 13, 2010)
- *Kellam v. Independence Charter School* (E.D. Pa., filed April 14, 2010)
- *Mayer v. Driver Solutions, Inc.* (E.D. Pa., filed April 30, 2010)
- *Hudson v. First Transit, Inc.* (N.D.Cal., filed July 20, 2010)

**NELP Criminal Records Charges Filed at EEOC**
- *Pacific Gas & Electric*
- *Comcast*
- *Lowe's*
- *Kelly's Services (2 charges)*
- *Quality Personnel*
- *Select Truckers*
- *de Young Museum*
- *Robert Half International*

## Client Stories

**Johnny MaGee,** *Garden Center Attendant at Lowe's*

In September 1999, 40-year-old Johnny MaGee, who is a developmentally disabled African American man, picked up a package for his uncle that, unknown to him, contained drugs. Johnny was arrested and convicted of misdemeanor conspiracy to commit a drug offense. He had never used drugs and has never been convicted of any other offense.

Johnny held a landscaping job at the Lawrence Livermore National Laboratory for six years until budget cuts forced him to look for a new job in 2008. He applied to Lowe's Home Improvement store in Dublin, California, for a garden center attendant position. Despite his related prior work experience, Lowe's refused to hire Johnny because of his conviction. "Lowe's policy is unfair to me and lots of other good people," said Johnny. "It's unfair because they only see something that happened to me many years ago, even though I've never been in trouble since." Later in 2008, Johnny petitioned the court for a dismissal of his conviction. It was granted and his "finding of guilt . . . [was] set aside."

In 2009, Johnny filed Title VII charges with the EEOC against Lowe's.

**Adrienne Hudson,** *Paratransit Driver with First Transit*

Adrienne Hudson is a 46-year-old African American woman with a single felony conviction for welfare fraud from 2002. After successfully completing her four days of jail time and five years of probation, Adrienne's felony was reduced to a misdemeanor and the conviction was judicially dismissed.

In March 2009, Adrienne left her position as a paratransit driver with MV Transportation to accept a position as a paratransit driver with First Transit, Inc., one of the nation's largest bus providers. Soon thereafter, Adrienne was terminated from her position with First Transit because of her criminal record. Although she informed First Transit that her conviction had been reduced and dismissed, she was nonetheless terminated from her position. This dismissal was consistent with First Transit's policy of refusing to hire or firing workers with a felony conviction or who had spent even so much as one day incarcerated.

On November 9, 2009, Adrienne filed a charge of discrimination with the EEOC and on June 1, 2010, she received a right to sue notice. Her class action lawsuit on behalf of African American and Latino workers was filed on July 20, 2010.

*CR (name withheld), Temporary Administrative Assistant Position with Robert Half International*

In 1980, CR, an African American woman, was convicted of a misdemeanor welfare violation for failing to report $200 of additional income. After completing her community service and paying all of her fines and restitution, CR successfully petitioned the court to have the conviction judicially dismissed from her record.

Over thirty years have passed since CR's only conviction. Now, with over ten years of administrative experience, two and a half years of which was in the healthcare industry, CR is struggling to find work in the current economy. She recently thought her job search was over when she was contacted by a subsidiary of Robert Half International and asked to apply for a position as an executive assistant in the healthcare industry. Though not required by law, CR disclosed her dismissed misdemeanor conviction, noting that it was over thirty years old. Once she disclosed the conviction, CR was informed that she was ineligible for employment by Robert Half because of her conviction.

CR recently filed an EEOC charge of discrimination against Robert Half and its subsidiaries.



LEHR MIDDLEBROOKS
& VREELAND, P.C.

# Employment Law Bulletin

JULY 2010
VOLUME 18, ISSUE 7

*Your Workplace Is Our Work®*

## Inside this issue:

Skeletons In The Closet: Employer
Background Checks Fuel Litigation
PAGE 1

Unions And Newspapers Share
A Common Problem
PAGE 2

Length of Service Requirement For
Leave: No Pregnancy Discrimination
PAGE 2

OFCCP Joins EEOC In Disability Focus
PAGE 3

Hospital's OSHA Citation Highlights
Importance of Workplace Violence
Policies
PAGE 3

EEO Tips: Does Arizona's New Law Clash
With The EEOC's Current Position On
Illegal Immigrants?
PAGE 4

OSHA Tips: OSHA Action Items
PAGE 7

Wage And Hour Tips: Current Wage
And Hour Highlights
PAGE 8

2010 Upcoming Events
PAGE 9

Did You Know...?
PAGE 9



FROM OUR EMPLOYER
RIGHTS SEMINAR SERIES:

## The Effective Supervisor

Montgomery ............. September 9, 2010
Birmingham ............. September 22, 2010
Huntsville ................ September 30, 2010

## Skeletons In The Closet: Employer Background Checks Fuel Litigation

The continuing high unemployment and under-employment rates bring greater scrutiny to employer hiring practices, as according to one report there are five candidates for every available job in our country. Of particular concern among applicants is an employer's use of credit and criminal history background checks. The recent case of Hudson v. First Transit, Inc. (N.D. Cal.) is a class action that was filed on July 20, 2010, alleging that an employer's practice of not hiring applicants with criminal convictions has a discriminatory impact on African-American and Latino candidates. In 2002, Adrienne Hudson, African-American, pled "no contest" to felony welfare fraud and spent four days in jail and five years on probation. In 2007, her successful completion of probation resulted in reducing her felony conviction to a misdemeanor, and then her charge was dismissed.

Hudson was employed as a bus driver for MV Transportation in Oakland, California, beginning in July 2008. She had an overall good work record. In February 2009, she applied for and was offered a job by First Transit. The offer stated that it was contingent upon First Transit's review of her criminal background check. She resigned her job with MV and accepted First Transit's offer. After First Transit became aware of Hudson's welfare fraud record, it terminated her employment. Thus, within a brief period of time, Hudson lost two jobs – the one she left, and the one she was terminated from due to her conviction record.

The lawsuit alleges that First Transit's practice is to reject candidates who have been convicted of a felony or sentenced to jail, regardless of how long ago the conviction occurred and how brief the sentence may have been. EEOC guidance states that although the use of conviction records is permissible, where a conviction record has an adverse impact on a protected class, the employer must show the job-relatedness of the reason for the conviction, the timing of the conviction in relationship to the application, and the relevance of the conviction to the job the individual has applied for.

We recommend that employers consider conviction records, but evaluate it based on what the conviction involved, when it occurred, the nature of the job sought, and what type of work the individual engaged in between the conviction and the time of his or her application.

© 2010 Lehr Middlebrooks & Vreeland, P.C. | 2021 Third Avenue North | Birmingham, AL 35203 | 205.326.3002 | www.lehrmiddlebrooks.com

Furthermore, rather than ask "Have you ever been convicted of a felony?" on an employment application, we recommend that an employer ask "Have you ever pled guilty or no contest to or been convicted of a crime?" There are certain crimes that may not be felonies, but they may be job-related. Use conviction records as necessary for the particular jobs in question, but do not overreach.

## Unions And Newspapers Share A Common Problem

Several years ago, a survey reported that over half of all adults in our country used the Internet as their primary source of news, not newspapers. The younger the adult, the greater the percentage of Internet use. Newspapers are folding, consolidating with other newspapers, and getting smaller, as they struggle to find new ways to reach the young adult market.

Union members are the "newspaper readers" of the labor movement – the younger worker simply has not been interested in the labor movement. In an effort to change this trend, the NFL-CIO conducted a Young Workers Summit on June 13th and will implement the following plans to attract younger members:

- Establish within the AFL-CIO a "young workers" division, with offices at the state level throughout the country.

- Develop websites for networking for internships and job opportunities.

- Establish a mentoring relationship with union leadership and long time union members.

- Develop an outreach strategy to high school, trade school and college students.

- Rebrand the labor movement to appeal to younger workers.

Within the younger worker target constituency, labor is also focusing on how to reach women under

age 35. A recent conference of women union activists expressed concern that younger women are looking to social justice organizations for involvement, rather than unions. According to a recent report funded by unions, sex discrimination and sexual harassment remain prevalent in the labor movement, a movement which is viewed by younger women as a male-dominated culture, where women are assigned to sit at the "kid's table" rather than at the "big boy" table.

Labor's membership numbers continue a substantial decline, although labor is as successful as it has ever been in winning workplace elections. As with newspapers, whether labor can reverse the downward trend in "readership" depends on how creative and innovative it is to reach the younger work force.

## Length Of Service Requirement For Leave: No Pregnancy Discrimination

Employers often have a policy that requires an individual to be employed for a certain period of time before the individual becomes eligible for a leave of absence. In the case of McFee v. Nursing Care Management of America (OH, June 22, 2010), the employer had a requirement that an individual must be employed for a minimum of one year before an extended leave of absence would be available. An employee who went on maternity leave after eight months was terminated under this policy and the court ruled that the termination was proper under the Ohio Fair Employment Practice statutes that prohibit discrimination based on pregnancy. The Ohio statute has analogous provisions to Title VII and the Pregnancy Discrimination Act (PDA).

The policy provides that an individual must be employed for 12 months before an individual is eligible for unpaid leave for any purpose. In upholding the employer's policy, the court stated that the policy is "pregnancy-neutral," as "a pregnant employee may be terminated for unauthorized absence just as any other employee who has not yet met the minimum length of service requirement but



takes leave based upon a similar inability to work." The court said the PDA does not require that pregnancy receive preferred treatment, "rather, it mandates that employers treat pregnant employees the same as non-pregnant employees who are similarly situated with respect to their ability to work."

Here is one word of caution to employers: Under the Americans with Disabilities Act, an employee with less than one year of service who requested a leave of absence for a disability-related reason cannot be denied that simply because the employer's policy says that the employee must work for at least a year. Rather, requests for leave under the ADA must be evaluated on a case-by-case basis to determine whether granting leave is a reasonable form of accommodation. Just as an employer cannot deny leave for military purposes or jury duty for an employee employed for less than one year under its policy, nor can an employer similarly rely on that policy to refrain from considering accommodation under the ADA.

## OFFCP Joins EEOC In Disability Focus

Of the 314 lawsuits the EEOC filed during its 2009 fiscal year, 76 involved ADA claims, an increase from 37 in 2008 (out of a total of 325 lawsuits). Although overall discrimination charges filed with the EEOC declined slightly in 2009 compared to 2008, ADA charges increased from 19,453 in 2008 to 21,454 in 2009, about 23% of total charges filed. We have noticed during the past several months throughout the country that the EEOC is spotlighting ADA charges in its investigatory and case handling process. We expect the EEOC will shortly issue its revised regulations interpreting the ADA, based on the ADA Amendments Act of 2009.

Against the EEOC backdrop, OFCCP is considering how it can strengthen affirmative action requirements for federal contractors to employ disabled applicants. The affirmative action requirement is pursuant to Section 503 of the Rehabilitation Act. The last comprehensive review and revision of the Rehabilitation Act occurred in

1996. According to Labor Secretary Hilda Solis, "It's time to update this regulation to ensure that everyone has access to good jobs, including individuals with disabilities."

OFCCP believes that although affirmative action for individuals with disabilities has been in effect for almost 40 years, the percentage of participation in the workforce of those with disabilities has changed only marginally during that time. OFCCP cited statistics from the Department of Labor's Bureau of Labor Statistics, which shows that 21.7% of those with disabilities were in the workforce as of June 2010, compared to 70.5% of those without disabilities. OFCCP stated that they have established target goals for the employment of women and minorities pursuant to affirmative action requirements, and perhaps they should consider the same thing for those with disabilities.

## Hospital's OSHA Citation Highlights Importance Of Workplace Violence Policies

*This article was written by Don Harrison, whose practice is concentrated in Workers' Compensation and OSHA matters. Don can be reached at dharrison@lehrmiddlebrooks.com or 205.323.9276. .*

OSHA recently cited a hospital in Connecticut for allegedly having an incomplete and ineffective workplace violence program. The hospital was cited under OSHA's general duty clause. OSHA issued a serious citation and fined the hospital $6,300.00. A hospital spokesman indicated the hospital would not contest the citation.

OSHA stated that an inspection identified several instances during the past 18 months in which employees in the hospital's psychiatric ward, emergency ward, and general medical floors were injured by violent patients. Reportedly, one of the instances involved an 86-year-old patient shooting a nurse.

In a press release, OSHA pointed to "the need for the hospital to develop a comprehensive, continuous


and effective program that will proactively evaluate, identify, prevent and minimize situations and conditions that place workers in harm's way."

OSHA provided suggestions for the hospital to address workplace violence, including:

- Creating a stand alone written violence prevention program for the entire hospital that includes a hazard/threat assessment, controls and prevention strategies, staff training and education, incident reporting and investigation, and periodic review of the program.

- Ensuring that the program addresses specific actions employees should take in the event of an incident and proper reporting procedures.

- Ensuring that security staff members trained to deal with aggressive behavior are readily and immediately available to render assistance.

- Ensuring that all patients receiving a psychiatric consultation are screened for a potential history of violence.

- Using a system that flags a patient's chart any time there is a history or act of violence and training staff to understand the system.

- Putting in place administrative controls so that employees are not alone with potentially violent patients in the psychiatric ward.

Although the citation was directed at a hospital, the case highlights the need for all employers to evaluate their anti-violence policies. Such policies should be crafted to reflect the particular circumstances of the employer, but certain elements should be common to all workplace violence policies.

For example, all policies should clearly establish that violence will not be tolerated in any form from anyone, including employees, customers, clients,

patients, or guests. Violence should be defined broadly to include not just physical confrontations but also verbal threats or harassment. The policy should clearly state that employees who engage in workplace violence will be disciplined up to and including termination, and that the necessary law enforcement authorities may be contacted. The policy should establish a convenient method for the reporting of any examples of violence, and include a statement that all reports will be taken seriously and promptly investigated.

## EEO Tips:
## Does Arizona's New Law Clash With The EEOC's Current Position On Illegal Immigrants?

*This article was prepared by Jerome C. Rose, EEO Consultant for the law firm of LEHR, MIDDLEBROOKS, & VREELAND, P.C. Prior to his association with the firm, Mr. Rose served for over 22 years as the Regional Attorney for the Birmingham District Office of the U.S. Equal Employment Opportunity Commission (EEOC). As Regional Attorney Mr. Rose was responsible for all litigation by the EEOC in the states of Alabama and Mississippi. Mr. Rose can be reached at 205.323.9267.*

As recently as July 15, 2010, a federal court in Oregon ordered an employer to stop questioning Hispanic farm workers concerning their immigration status and their employment history. The case, *EEOC v Williamette Tree Wholesale, Inc. of Molalla, Oregon* (CV-09-690-PK), had been filed on behalf of a number of Hispanic farm workers who allegedly had been sexually harassed (including the alleged rape of one of the charging parties) and threatened in retaliation for reporting the harassment.

According to the EEOC's press release, the court in granting the protective order stated in substance that "the public interest would be far better served if meritorious discrimination claims were presented by immigrants regardless of their status, rather than if the potentially chilling effect of scrutinizing plaintiff's documentation prevented workers from coming forward."

Similarly, in the case of *EEOC v. KCD Construction, Inc.* (D. Minn. No. 05-2122, Feb. 2006), the court granted a motion for a protective order filed by the

EEOC to prevent the defendant/employer from seeking discovery regarding certain Hispanic employees' citizenship, immigration and work permit status. Although there are many others, these cases outline the general philosophy of the EEOC that an employer cannot discriminate against employees after hiring them, and then use their immigration status as a sword over their individual or collective heads to threaten them if they complain about discrimination.

In June 2002, the Commission rescinded its Guidance on Remedies Available to Undocumented Workers Under Federal Employment Discrimination Laws (which had been issued in 1999) as the result of the U.S. Supreme Court's holding in *Hoffman Plastic Compounds, Inc. v. National Labor Relations Board*, 122 S. Ct. 1275 (2002). In that case, the Supreme Court held that "federal immigration policy precludes an award of back pay to an undocumented worker under the National Labor Relations Act (NLRA)." As a result of the *Hoffman* case, the EEOC rescinded its back pay provisions but stated that "it will not, on its own initiative, inquire into a worker's immigration status, or consider an individual's immigration status when examining the underlying merits of a charge."

Perhaps more to the point, the Commission's Guidelines on National Origin at 29 C.F.R. 1606.5(a) and (b) state:

> (a) ... where citizenship requirements have the purpose or effect of discriminating against an individual on the basis of national origin, they are prohibited by Title VII, and
>
> (b) Some state laws prohibit the employment of non-citizens. Where these laws are in conflict with Title VII, they are superseded under Section 708.

In sharp contrast to the EEOC's policy of turning a blind eye to a worker's immigration status, especially after a charge has been filed, Arizona's controversial anti-illegal immigrant law, S.B. 1070, which is called the "Support Our Law Enforcement and Safe Neighborhoods Act," would penalize employers for not knowing the immigration status of each of its employees at all times. S.B. 1070, which is scheduled to go into effect on July 29, 2010, among other things, contains the following provisions pertaining to an employer's hiring responsibilities, which apparently conflict with the EEOC's regulations:

Section 6.

A. An employer shall not knowingly (or intentionally under Sec. 7) employ an unauthorized alien. If, in the case when an employer uses a contract, subcontract or other independent contractor agreement to obtain the labor of an alien in this state, the employer knowingly contracts with an unauthorized alien or with a person who employs or contracts with an unauthorized alien to perform the labor, the employer violates this subsection.

This section further provides that a violation of the section would subject the employer to various penalties, including the suspension of an employer's license to operate at the location in question. However, the Act provides that no action would be taken against an employer for any hiring violation that occurred before January 1, 2008. After that date, the Act provides that employers must E-verify the employment eligibility of every applicant.

This begs the question whether there is a serious conflict between S.B. 1070's strict limitations on the employment of unauthorized aliens and the EEOC's policy of ignoring immigration status in enforcing federal anti-discrimination laws? Certainly on its face there would seem to be a conflict. The Arizona Law specifically prohibits the hiring of "unauthorized aliens," but also leaves open the possibility that "unauthorized aliens" who were hired before January 1, 2008 and continue to work for the employer may be subject to the EEOC's policies if they file a charge under Title VII or other federal antidiscrimination laws.

Incidentally, the question of how S.B. 1070 interacts with the Immigration Reform and Control Act of 1986 (IRCA) may also need to be addressed at some point, even though there is no apparent conflict because it too was intended to regulate the hiring of



LEHR MIDDLEBROOKS
& VREELAND, P.C.

non-citizens. It covers employers with four or more employees. IRCA may be one of the federal immigration laws which the U.S. Justice Department claims have preempted S.B 1070's immigration provisions. However, our concern in this article is only with the statutes enforced by the EEOC.

The main problem is that other states, apparently, are adopting laws similar to Arizona's S.B. 1070 to regulate the status of undocumented immigrants. Thus, employers need to be aware of potential conflicts with the EEOC's current position on these issues. A truly comprehensive discussion of the areas of conflict would be beyond the scope of this article but for starters here are a few things that employer's should know:

- Generally, Title VII does not prohibit employers from refusing to hire an applicant on the basis of citizenship. What is prohibited is discrimination on the basis of national origin. The EEOC's regulations state that Title VII is violated when citizenship requirements have the "purpose or effect" of discriminating on the basis of national origin as determined by the U. S. Supreme Court in *Espinoza v. Farah Mfg. Co.*, 414 U. S. 86 (1973). Note that IRCA prohibits discrimination based on citizenship status if the individual has the right to work in the U.S., even if not a citizen.

- Likewise a state law that prohibits the employment of non-citizens will be superseded by Title VII whenever such laws have the purpose or effect of discriminating on the basis of national origin.

- To determine whether a hiring transaction has the purpose or effect of discriminating on the basis national origin, the EEOC will analyze statistical data that shows the percentage of persons of the charging party's national origin in the SMSA, in the employer's workforce, and those with requisite skills in the relevant labor market as reflected in similar job classifications, assignments or duties.

Thus, the question for employers is not whether they can make inquiries about an employee's immigration status, but rather when such questions can be asked. Generally, from the EEOC's viewpoint, it is safe to say that:

1. Inquiries as to immigration status can <u>always</u> be made <u>before</u> an employee is hired.

2. Inquiries can sometimes be made after an undocumented immigrant is hired but before a charge is filed so long as the inquiry is neither to suppress a complaint of an unlawful employment practice nor in retaliation for making a complaint about unlawful discrimination under one of the statutes enforced by the EEOC.

3. It is risky to inquire about immigration status after a charge is filed because it suggests that the employer is either retaliating or attempting to create a "chilling" effect on the charging party or other undocumented immigrants with respect to the filing of a charge with the EEOC.

The foregoing barely touches the surface of the many, potentially conflicting issues which could arise between state laws like Arizona's S.B. 1070 and the EEOC's current position on the matter of undocumented immigrants. The Arizona law has been challenged by the U.S. Department of Justice on grounds that at least some of its basic provisions pertaining to immigration law have been superseded by federal law.

As of this publication, a federal judge in Arizona has granted a preliminary injunction against the implementation of Arizona's enforcement of the two most controversial aspects of the Arizona law, including provisions of the law that call for police officers to check a person's immigration status while enforcing other laws and that required immigrants to carry their papers at all times. Remaining challenges to the Arizona law will be decided by the courts in coming weeks/months.

© 2010 Lehr Middlebrooks & Vreeland, P.C. | 2021 Third Avenue North | Birmingham, AL 35203 | 205.326.3002 | www.lehrmiddlebrooks.com


At this point, it is purely a matter of conjecture as to whether the outcome of these court challenges will benefit the EEOC or employers in those states where similar laws are being enacted. We will keep you posted on any significant developments.

## OSHA Tips:
## OSHA Action Items

*This article was prepared by John E. Hall, OSHA Consultant for the law firm of Lehr Middlebrooks & Vreeland, P.C. Prior to working with the firm, Mr. Hall was the Area Director, Occupational Safety and Health Administration and worked for 29 years with the Occupational Safety and Health Administration in training and compliance programs, investigations, enforcement actions and setting the agency's priorities. Mr. Hall can be reached at 205.226.7129.*

With growing evidence of aggressive enforcement and stiffer monetary penalties, employers might be wise to assess their readiness for an OSHA inspection. Such an assessment should include ensuring that the required annual or periodic actions called for in a number of standards have been addressed. Examples of some of the generally applicable standards having such a requirement include the following:

- All recordable injury and illness cases must be entered on an establishment's injury and illness log within 7 days of receiving information of a case. The calendar year summary of injuries and illnesses needs to remain posted from February 1 through April 30 of each year.

- When a facility has employees with occupational exposure to blood or potentially infectious material, the required "exposure control plan" must be reviewed and updated at least annually. 29 CFR 1910.1030(c) and (d).

- Employers must inform employees upon initial hire and at least annually about the existence and right of access to their medical and exposure records. 29 CFR 1910.1020(g)(1).

- Employees exposed to an 8-hour time weighted average noise level at or above 85 decibels must have a new audiogram at least annually. 29 CFR 1910.95(g)(6).

- OSHA's Permit Required Confined Space standard requires that the program be reviewed by using canceled permits within 1 year of each entry. The standard also allows a single annual review utilizing all entries made within the 12-month period. 29 CFR 1910.146(d)(14).

- Under OSHA's standard for the control of hazardous energy (lockout/tagout), an employer is required to conduct a periodic inspection of the energy control procedure to ensure that the requirements of the standard are being met. This must be done at least annually with certification that it has been accomplished. 29 CFR 1910.147(c)(6).

- After the initial fit testing of an employee's tight-fitting respirator, there must be another fit test at least annually. 29 CFR 1910.134(2). Further, employees wearing such respirators must be retrained at least annually. 29 CFR 1910.134(k)(5).

- Annual maintenance checks must be made of portable fire extinguishers and records documenting these checks must be maintained. 29 CFR 1910.157(a)(3). Also, when an employer has provided an extinguisher for an employee use, he must train the employee for such use initially and then at least annually thereafter. 29 CFR 1910.157(g)(2).

- OSHA standards require inspections of cranes and crane components at established intervals. For instance, crane hooks and hoist chains must be inspected daily with monthly inspections that include certification records. 29 CFR 1910.179(j)(2). Complete inspections of cranes must be made at "periodic" intervals which are defined as between 1 to 12 months. 29 CFR 1910.179(j)(3).


- Operators of powered industrial trucks, such as forklifts, must have their performance evaluated at least once every 3 years. 29 CFR 1910.178(l)(4)(iii).

- Mechanical power presses must be inspected no less than weekly with a certification record giving the date, serial number or press identifier, and signature of the person who performed the inspection. The most recent records of such inspections should be retained.

Note that many of OSHA's substance-specific health standards contain periodic action requirements for exposure monitoring, training and the like.

# Wage And Hour Tips: Current Wage And Hour Highlights

*This article was prepared by Lyndel L. Erwin, Wage and Hour Consultant for the law firm of Lehr Middlebrooks & Vreeland, P.C. Mr. Erwin can be reached at 205.323.9272. Prior to working with Lehr Middlebrooks & Vreeland, P.C., Mr. Erwin was the Area Director for Alabama and Mississippi for the U. S. Department of Labor, Wage and Hour Division, and worked for 36 years with the Wage and Hour Division on enforcement issues concerning the Fair Labor Standards Act, Service Contract Act, Davis Bacon Act, Family and Medical Leave Act and Walsh-Healey Act.*

Among the many changes that are being made by the current administration is the institution of a different method of responding to inquiries from the public regarding Wage and Hour's interpretation of the application of the Fair Labor Standards Act. Previously, the Wage and Hour Administrator had issued written opinion letters addressing a specific set of facts but on March 24, 2010, Wage and Hour issued the following statement:

In order to provide meaningful and comprehensive guidance and outreach to the broadest number of employers and employees, the Wage and Hour Administrator will issue Administrator Interpretations when determined, in the Administrator's discretion, that further clarity regarding the proper interpretation of a statutory or regulatory issue is appropriate. Administrator Interpretations will set forth a general interpretation of the law and regulations, applicable across-the-board to all those affected by the provision in issue. Guidance in this form will be useful in clarifying the law as it relates to an entire industry, a category of employees, or to all employees. The Wage and Hour Division believes that this will be a much more efficient and productive use of resources than attempting to provide definitive opinion letters in response to fact-specific requests submitted by individuals and organizations, where a slight difference in the assumed facts may result in a different outcome. Requests for opinion letters generally will be responded to by providing references to statutes, regulations, interpretations and cases that are relevant to the specific request but without an analysis of the specific facts presented. In addition, requests for opinion letters will be retained for purposes of the Administrator's ongoing assessment of what issues might need further interpretive guidance.

Whereas the Administrator opinion letters could provide an employer with a "good faith defense" if the employer was later found to be in violation of the FLSA, even if he was following the procedures set forth in the opinion letter, it is unclear whether the Administrator Interpretations will provide such protection. The first such interpretation, issued in March 2010, dealt with the application of the administrative exemption to Mortgage Loan Officers. A second such interpretation, issued in June 2010, deals with the donning and doffing of protective gear and the definition of clothes and will most likely affect more employers. Consequently, I will provide an explanation of the second interpretation.

Section 3(o) of the FLSA excludes from hours worked time an employee spends in changing clothes on the employer's premises. In a 1997 opinion letter, the Administrator explained that the "plain meaning" of "clothes" as used in the Act did not encompass protective equipment commonly used in the meat packing industry (e.g., mesh aprons, plastic belly guards, plastic mesh sleeves or plastic arm guards, wrist wraps, mesh gloves, rubber

© 2010 Lehr Middlebrooks & Vreeland, P.C. | 2021 Third Avenue North | Birmingham, AL 35203 | 205.326.3002 | www.lehrmiddlebrooks.com


gloves, polar sleeves, rubber boots, shin guards and weight belts). Consequently, the time spent in the donning and doffing of the protective gear would be work time. Wage and Hour issued additional opinion letters in 1998 and 2001 confirming this interpretation. However, in 2002 the Wage and Hour Administrator issued an opinion letter rejecting the previous determinations and stating that the commonly used protective gear was in fact clothes and thus the time spent in donning and doffing of the gear could be excluded from determining the employee's hours worked. The current Administrator Interpretation rejects that definition of clothes and thus states that time spent in the donning and doffing the protective gear is work time and must be paid for.

Further, in the June 2010 document, the Administrator opines that even though time an employee spends in changing clothes is excluded from work time by section 3(o) of the FLSA, it is an integral part of the workday and thus may be a principal activity. Where that is the case, subsequent activities, including walking and waiting, are compensable. The effect of this interpretation is that the time an employee spends in walking to and from the "change house" to his/her workstation is compensable even though the time spent changing clothes is not compensable.

Also, in June 2010, the Administrator issued a third interpretation dealing with the definition of "son or daughter" under the Family and Medical Leave Act, an issue we discussed in last month's Employment Law Bulletin. Copies of each of the Administrator Interpretations are available on the Wage and Hour web site at http://www.dol.gov/whd/index.htm.

There continues to be much litigation under the Fair Labor Standards Act and the Family and Medical Leave Act, as well as stepped up enforcement by Wage and Hour. They are still hiring additional investigators and one area they (and the Internal Revenue Service) are looking at is the classifying of employees as independent contractors in order to evade the requirements of the Acts. Employers should continue to be diligent in their efforts to comply with these Acts by reviewing pay and record

keeping policies on a regular basis. If I can be of assistance, do not hesitate to give me a call.

## 2010 Upcoming Events

### EFFECTIVE SUPERVISOR®

Montgomery-September 9, 2010
  Hampton Inn and Suites

Birmingham-September 22, 2010
  Bruno Conference Center

Huntsville-September 30, 2010
  U.S. Space and Rocket Center

### RETAIL SERVICE HOSPITALITY INDUSTRY BRIEFING

Birmingham – September 17, 2010
  Vulcan Park

### MANUFACTURERS' BRIEFING

Birmingham – November 18, 2010
  Vulcan Park

### BREAKFAST BRIEFINGS: EMPLOYER RIGHTS UPDATE

Decatur – August 31, 2010
  Holiday Inn, Decatur

Auburn/Opelika – September 1, 2010
  Hampton Inn & Suites, Opelika

For more information about Lehr Middlebrooks & Vreeland, P.C. upcoming events, please visit our website at www.lehrmiddlebrooks.com or contact Marilyn Cagle at 205.323.9263 or mcagle@lehrmiddlebrooks.com.

## Did You Know…

…that employers who exchanged compensation information are now subject to a lawsuit based on alleged anti-trust violations? Fleischman v. Albany Medical Center, (N.D. N.Y., July 22, 2010). The exchange of compensation and benefits information

© 2010 Lehr Middlebrooks & Vreeland, P.C. | 2021 Third Avenue North | Birmingham, AL 35203 | 205.326.3002 | www.lehrmiddlebrooks.com

is a widespread HR practice, as employers seek to benchmark their wage and benefit package in comparison to others. In this case, the allegation is that hospitals regularly exchanged information with each other about pay rates for registered nurses with an agreement that exchanging the pay rates would help keep the pay at lower levels. One such lawsuit has been settled with damages of nearly $2,000,000 to the affected class members.

...that a number of smaller employers may prefer to pay penalties rather than offer insurance under the Patient Protection and Affordable Care Act? The penalties for not providing health insurance, beginning in 2014, are approximately $2,000 per employee, per year. Several employers, particularly those in the restaurant and hospitality industries, have said that it would cost the employer approximately $8,000 per employee to provide insurance coverage. Therefore, paying the penalty is the business decision of least economic consequence, compared to paying for insurance coverage.

...that a former President and Business Manager of Local 608 of the Carpenters' Union pled guilty on July 16th to racketeering and corruption charges? Local 608 has approximately 7400 members in the New York City area. The corruption lasted over 15 years, and involved soliciting cash bribes from construction contractors and permitting those contractors to pay its workforce below the union rates and avoid paying into the union's benefit funds. In addition to the local union president, six other officials of the Local have entered guilty pleas.

...that in one of the largest settlements ever, Novartis agreed to a $175,000,000 settlement with a nationwide class of current and former female employees? Velez v. Novartis Pharmacy Corporation (S.D. N.Y., July 14, 2010). The class included approximately 5600 current and former employees who claimed discrimination in promotions and pay and also alleged that they were subjected to a hostile work environment. The settlement occurred approximately two months after a jury awarded $250,000,000 in punitive damages to women who brought a lawsuit against Novartis alleging sexual

harassment. The $175,000,000 settlement includes $22,500,000 for training, a revised internal complaint process, and enhanced equal opportunity processes for promotion consideration.

...that the National Manufacturing Strategy Act was approved by the House Energy and Commerce Committee on July 21? This legislation, introduced in February, would create a board to conduct a comprehensive analysis of U.S. manufacturing, the outcome of which would be a strategy to retain and enhance manufacturing in our country. The bill would create a manufacturing strategy board to include public and private sector representatives.

### LEHR MIDDLEBROOKS & VREELAND, P.C.

| | |
|---|---|
| Donna Eich Brooks | 205.226.7120 |
| Whitney Brown | 205.323.9274 |
| Lyndel L. Erwin | 205.323.9272 |
| (Wage and Hour and Government Contracts Consultant) | |
| John E. Hall | 205.226.7129 |
| (OSHA Consultant) | |
| Donald M. Harrison, III | 205.323.9276 |
| Jennifer L. Howard | 205.323.8219 |
| Richard I. Lehr | 205.323.9260 |
| David J. Middlebrooks | 205.323.9262 |
| Jerome C. Rose | 205.323.9267 |
| (EEO Consultant) | |
| Matthew W. Stiles | 205.323.9275 |
| Michael L. Thompson | 205.323.9278 |
| Albert L. Vreeland, II | 205.323.9266 |
| Debra C. White | 205.323.8218 |

THE ALABAMA STATE BAR REQUIRES
THE FOLLOWING DISCLOSURE:
"No representation is made that the quality of the
legal services to be performed is greater than the quality of
legal services performed by other lawyers."

# AmericanRenaissance.com

*There is not a truth existing which I fear or would wish unknown to the whole world. — Thomas Jefferson*

Search

- Welcome
- Contact Us
- AR Store
- Subscribe
- Archives

Previous Story   Next Story   View Comments   Send This Page   Date Archives   Category Archives











New Sam Francis anthology

Taylor vs. March: The Halifax Diversity Debate! Available for purchase on DVD and CD

Back in Print!



Frank Salter's *On Genetic Interests*

**N E W !**

## Class Action Suit Claims Employment Discrimination by Bus Company

**More news stories on Anti-Discrimination Law**

*Angela Hill, Oakland Tribune, July 20, 2010*

An Oakland woman is the lead plaintiff in a federal class action lawsuit against the Ohio-based First Transit bus company, one of several service providers for East Bay Paratransit, claiming the company's hiring policy barring applicants with felony convictions is discriminatory against blacks and Latinos and violates civil rights and fair employment laws.

The complaint, filed Tuesday in U.S District Court in San Francisco on behalf of 44-year-old Adrienne Hudson, is backed by the nation's largest transit unions. It asserts that, because blacks and Latinos have a higher incarceration rate nationally, employment-selection policies based on criminal background checks—such as First Transit's—have "a disparate impact on African-American and Latino job applicants and employees."

{snip}

The suit states that Hudson, who is black, was hired at First Transit's Oakland office in 2009. She trained for three weeks and was driving a bus for only two days when she was fired after her background check came through, revealing a 2002 felony conviction for welfare fraud, which was later reduced to a misdemeanor and eventually dismissed in 2007.

{snip}

The suit seeks monetary damages and an elimination of such hiring practices.

Officials with the Amalgamated Transit Union, the nation's largest union of mass transit workers, say the policy violates the 1964 Civil Rights Act which states employers can't base hiring on a past felony conviction if it would disproportionately impact minority groups.

{snip}

**Original article**

(Posted on July 23, 2010)

Like          0          0     Share

Previous story   Next Story   Post a Comment   Send This Page   Search

## Comments

1 — Question Diversity wrote at 6:05 PM on July 23:

I might need correction here, but I think CRA '64 allows for employment discrimination based on past criminal history, but only allows for employers to check for and make decisions based on felony convictions (not felony charges or misdemeanor convictions or anything else) only.









Jared Taylor on Free Speech



Is he really 'post racial'?



Radio interview: Fort Hood Shooting



WIKIPEDIA
Bias at Wikipedia

Jared Taylor's *Africa in our Midst: Lessons from*



Race and The
American Prospect
Sam Francis, Editor



A Race Against
Time: Racial
Heresies for the
21st Century
Read VDARE's review
See other AR books
here



Available for
download

Free download!



The Color of
Crime

2 — Spartan24 wrote at 7:58 PM on July 23:

From this article the charges were lowered to a misdemeanor and then dropped. Based on this information she does have grounds for a lawsuit. A couple of years ago a "security" program vetting workers and truck drivers entering certain ports was begun. It was a nightmare since people who had felonies from 25 years ago and long set aside were harassed and threatened with losing gainful employment even though the offence was expunged except for if the person reoffended. Worse yet people who were merely arrested and no charges filed or charges dropped had to explain themselves and show paperwork. The stupid thing about this program was that foreign crew members of ships could enter without any sort of vetting and there would be your terrorist!

3 — Rob wrote at 8:56 PM on July 23:

Officials with the Amalgamated Transit Union, the nation's largest union of mass transit workers, say the policy violates the 1964 Civil Rights Act which states employers can't base hiring on a past felony conviction if it would disproportionately impact minority groups.

So, in other words (according to this union), it's okay to deny a white guy with a felony conviction, but you better not deny a "minority" with a felony on their record.

4 — THE MAN wrote at 7:16 AM on July 24:

When you apply for a job and fill out an application there is a question "Have you ever been convicted of a felony"? If you lie on the application you have committed fraud.I would think that either this question is not on the form or if it is she lied.The removal would not be for her past criminal record but for lying.

5 — Jay wrote at 7:56 AM on July 24:

I think this suit doesn't go far enough! Social justice demands this to be a nationwide, across-the-board precedent!

Past criminal activity, if no longer valid as an employment screen for bus drivers who drive our children to school, should also not bar a person from being a teacher, day care worker, nurse, police officer or even secret service agent!

To heck with the whole system of standards! If you have minimum standards of education, honesty and ability then it's going to discriminate against someone eventually!

Look at many third world nations where the only standards you need to pass are the ability to give and receive bribes. And those places are social justice paradises where no discrimination ever occurs!

On a side note, it is most probable that those bus companies service large minority districts, so if they want people with criminal records to drive their kids to school, it won't bother me because that's what they want.

6 — olewhitelady wrote at 10:27 AM on July 24:

This particular woman did have a claim according to the rules under which she was hired, and she won her case. Evidently, in the course of things, a do-gooder group jumped into the fray and pushed the concept of racial discrimination along with her personal suit, which had nothing to do with race.
Public transit is not going to be forced to hire felons because doing so might hurt business. And the courts now defer much more to the elite rich than it does the poor, minorities or not.

Katrina.



The Mexican
government tells
Mexicans how to
break into the US
(English translation)



Hate Crimes, Real
and Imagined



Anti-White Hate
Speech

┌─ 7 — Anonymous wrote at 12:50 PM on July 24:

Three Comments:

1. Why did the woman lie on her application form?
It used to be that lying about your criminal history, even if only for an /arrest/ was sufficient to get you fired.

2. How many people who had NO criminal record were screwed over so that this company could fill a quota wherein she is insured for the value of the passengers, the vehicle and the luggage?

3. Was the woman guilty of the crime?
If it was subsequently knocked down 'for the convenience of the court', it is the same as saying she did indeed commit felony fraud and the court system is in collusion with her to cover up her criminal record.

Someone needs to grow a pair and COUNTER SUE for the full value of litigation and 'damages' equivalent to the lost time spent fiddling with this nonsense. So that the Feds and their Civil Rights Thugs can be on the losing side a few times.

The 1964 CRA does not protect felons. It SHOULD NOT protect those who lie about felony arrests and then wonder why their past comes back to them.

And while we're at it, let's sue whatever vetting company is taking TWO DAMN YEARS to clear the employees of this undoubtedly insured bus service for putting passengers and vehicles at risk and due to increase premiums likely to be incurred for having someone with a criminal record on a rider that says all covered agents of the company are clean.

┌─ 8 — Spartan24 wrote at 4:13 PM on July 24:

If a person has gone to court and had their felony legally set aside or expunged then they can legally answer the question 'have you been convicted of a felony' as "no". To do this someone has had to sucessfully completed parole and not reoffended for a number of years. The record is not totally gone and they will probably not get their second amendment rights back but they cannot be denied employment.

┌─ 9 — white is right, black is whack wrote at 9:54 PM on July 25:

And I'm sure these felony convictions with blacks and hispanics are all white people's fault, huh? Do blacks and hispanics ever admit they're responsible for their own shortcomings? I'm sick and tired of blacks, hispanics, and liberals telling employers, landlords, and everyone who they have to do business with.

┌─ 10 — John Engelman wrote at 7:36 AM on July 26:

Racial discrimination is only illegitimate if it is based on race alone. If it is based on something that varies with race, such as criminal record or performance on a mental aptitude test, it is not only acceptable, it is proper.

┌─ 11 — Michael C. Scott wrote at 1:58 PM on July 26:

Not hiring felons also discriminates against thieves, rapists and drug addicts. If you are running a business and want honest, reliable employees, this is generally a good thing.

┌─ 12 — Anonymous wrote at 6:30 PM on July 26:

This is a joke, she just wants her homeys to not be held accountable for the actions THEY chose and still be available for an Affirmative Action cushy job.

┌─ 13 — Senor Huevos wrote at 7:56 PM on July 26:

Ha! Guess this lawsuit PROVES what we've known all along - that the majority of felonies are committed by blacks and Hispanics!! And if THIS lawsuit comes out in favor of the plaintiff, what's that going to do to the requirement for teachers in the public schools that they have no felonies??? Do we have to put ex-cons in our public schools to teach our kids? What a bunch of bull. White folks, HOMESCHOOL your kids - God alone knows what they're going to install as teachers in public schools in the future!!!

The contents of this website are copyright © 1990-2011 New Century Foundation. All Rights Reserved.

Search AllBusiness

 

News Getting Started Sales & Marketing Finance Staffing & HR Operations Technology Franchising Industries Resources




SAVE TIME. SAVE MONEY.
**SAVE THE DAY.**
SOUTHWEST.COM

**TRENDING NOW:** Financial Resource Center, Free Downloads!, Credit Crunch Plagues Small Businesses


NEW
UNITED
Apply today and explore
a new world of benefits:
**+ Free Checked Bag**
Up to 40,000 Bonus Miles
EXPLORE NOW
First Year Free
$95 Value
UNITED MileagePlus Explorer
CHASE
VISA SIGNATURE

AllBusiness Video



**The Value of Bootstrapping to Fund Your Business**

Raising money to run your small business can be a challenge. Tim Berry shares advice on how to bootstrap your way to better cash flow.

See More Videos

NEW on AllBusiness

**Dysfunctional Government Reigns in Washington**

The Great Debt Debate was needless, destructive, and won't solve the deficit problem, says Keith Girard.

**Web Analytics Tips for E-Commerce Success**

Are your marketing channels optimized to help customers buy from your small


allBusiness a dun & company
Don't just survive the recession. **Thrive**
**Get a business loan with Biz2Credit®**
1 Register & submit a loan application
2 Receive loan options
3 Interact with lenders & get a loan!
See how it works

## Recommends



**Small Firms Wrestle With Social Media Monitoring**
Go ahead — track what employees are saying online. Just beware of legal land mines.

**Top 10 Ways To Motivate Employees — Cheap!**
You don't have to spend big $$$ to keep your workers working hard.

**Time To Ditch Microsoft Office?**
Are cloud computing suites from Microsoft and Google ready for your small business?



business?

**Does Every Business Need a Company Culture?**
Culture and people fuel growth, not the other way around, says Marissa Levin of Information Experts.

**The Benefits Young Franchisees Bring to Franchising**
Young people bring a unique set of skills to franchising that can help a system grow.

RELATED

INDUSTRY TOPICS

Litigation

Southwest USA

San Francisco Bay Area

Motorcoaches & Buses

Suits & Claims

CONTENT

**Disabled still face daily trials on T**

**MetroAccess driver sought on sex assault charges**

**24 Hour Fitness slapped with discrimination suit**

**FWCS sued over bus mix-up, injuries**

**Law Offices of Ricardo A. Guarnero, P.S. File a Motion for Class...**

**San Diego lawyer and A's settle class-action sex discrimination...**

**Discrimination suit filed in Alameda County Superior Court against...**

**Lieff Cabraser and Three Civil Rights Organizations Charge Abercrombie...**

**Class action filed in U.S. District Court for Northern District of...**

Share

July 20--OAKLAND -- An Oakland woman is the lead plaintiff in a federal
class action lawsuit against the Ohio-based First Transit bus company,
one of several service providers for East Bay Paratransit, claiming the
company's hiring policy barring applicants with felony convictions is
discriminatory against blacks and Latinos and violates civil rights and
fair employment laws.

The complaint, filed Tuesday in U.S District Court in San Francisco on
behalf of 44-year-old Adrienne Hudson, is backed by the nation's largest
transit unions. It asserts that, because blacks and Latinos have a higher
incarceration rate nationally, employment-selection policies based on
checks -- such as First Transit's -- have "a
African-American and Latino job applicants and

anket ban for anyone who has ever had a felony
an Resnick, a Chicago attorney representing
a ban, which doesn't take into consideration the
he offense, or whether the offense is related to the
vehicular manslaughter for a job as a bus driver -
one who has ever spent a day in jail on a
, not only affects that individual, but has societal

Copyright © 1999 - 2011 AllBusiness.com, Inc. All rights reserved. No part of this content or the data or information included therein may be reproduced, republished or redistributed without the prior written consent of AllBusiness.com. Use of this site is governed by our Copyright and Intellectual Property Policy, Terms of Use Agreement and Privacy Policy.

Copyright 2010 The Oakland Tribune

© LexisNexis 2011

LexisNexis Terms & Conditions | LexisNexis Privacy Policy

Copyright © 2009 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

You may not repost, republish, reproduce, package and/or redistribute the content of this page, in whole or in part, without the written permission of the copyright holder.

Get In-Depth Company Information from Hoover's

What is in Your Company's D&B Credit Report?

View All D&B Sales & Marketing Solutions

Get Email Lists from D&B Professional Contacts

Build Mailing Lists from Zapdata

Company Profiles

Get Your D&B DUNS Number

Gain Credibility

Information and opinions on AllBusiness.com solely represent the thoughts and opinions of the authors and are not endorsed by, or reflect the beliefs of, AllBusiness.com, its parent company D&B, and its affiliates.



# Transport Workers Solidarity Committee
**An injury to one is an injury to all!**

Home | Industries | Regions Us | Campaigns Images | History Links | Support Us | Contact

## Navigation

- audio
- easylinks
- links
- petitions
- recent posts
- groups
- news aggregator
- RSS feeds

## User login

**Username:** *

**Password:** *

[Log in]

- Request new password

## Who's online

There are currently 0 users and 108 guests online.

## Who's new

- dead dog
- ulockwarrior
- mickd
- jdemaegt
- solidarity

## Bookmark Us

[×] Bookmark Website
Bookmark Website

[×] Bookmark Page
Bookmark Page

## Syndicate



more

Home

# First Transit Sued for Discrimination against African-Americans, Latinos

Submitted by solidarity on Fri, 2010-07-23 17:49. Rail and Bus | Texts | USA | Workers Defense | Workers' Defense

First Transit Sued for Discrimination against African-Americans, Latinos

## Follow Us





## Search

[            ]
[Search]

## Upcoming events

- no upcoming events available


more

## Labour Start - Act Now

- Malawi: Respect Human Rights and Allow Peaceful Protest
- Korea: Stop the prosecution and harassment of public workers
- Palestine: Solidarity with striking quarry workers

more

## Labor News

- The NEA's Circus
- Verizon Strike: As Billions Roll In, Workers Walk Out
- Honeywell Uranium Workers End Lockout, Accept Concessions
- Strike Beats Back Pension Cuts at NY Nuclear Plants
- Next Low-Wage Haven: USA
- Koreans Brave Pepper Spray, Thugs to Rally at Crane Sit-In
- The NEA's Circus
- Israel : Histadrut to Fight 'Pri Galil' Layoffs

- Israel : Vita Pri Galil fires 58
- Norway : Userløst av IndustriEnergi

more

## Labour Start - Top Stories

- Kazakhstan: Striking Kazakh Oil Workers' Lawyer Gets Six-Year Jail Term
- Fiji: Warning on Fiji government plan to severely restrict workers' rights
- Global: Union Leaders call for emergency G20 Summit to respond to run on financial markets

more

## AFL-CIO

- Support Growing for Verizon Strikers
- Steady Turnout as Wisconsin Voters Try to Recall Walker 6
- It's a Tough Call. Who's the Worst Governor Ever?

more

## IWW - Transportation and Communication Department 500

- The Railroad Industry & the Need for One Big Union
- Rally Defends Union's Right to Close Bay Area Ports

more

## International Transport Workers' Federation

- Union representation rights for UPS workers in Turkey
- ITF protest over job cuts at Japan airline
- Solidarity with the Norwegian people

more

## Labor Notes - Stewards Corner

- Democrats Join the Raid On Union Bargaining Rights
- Minneapolis Grocery Store Cleaners Launch Hunger Strike
- California Teachers Declare State of Emergency

more

http://www.atu.org/content/atu_news/first_transit_sued_for_discrimination_against_african-american_latino_/

First Transit Sued for Discrimination against African-Americans, Latinos

ATU — OAKLAND, CA (7/20)

Class action lawsuit backed by nation's largest transit union asserts that major provider of paratransit and bus service violates federal race discrimination laws in its operations across the United States.

Workers with criminal records barred from employment no matter how old the conviction.

OAKLAND, CA: A class action lawsuit was filed today against First Transit, Inc., one of the nation's largest bus companies, for illegal discrimination against African-American and Latino employees and job applicants.

The lead plaintiff, Adrienne Hudson, is an African-American woman who was fired in 2009 by First Transit in Oakland, CA, after just two days on the job. The legal action is supported by the Amalgamated Transit Union (ATU), the nation's largest union of mass transit workers, and the National Employment Law Project (NELP), a non-profit organization advocating for employee rights.

At issue is a company-wide policy implemented by First Transit – a subsidiary of British conglomerate FirstGroup, plc, which also owns First Student, the nation's largest school bus company, and Greyhound, the nation's largest provider of intercity bus transportation.

'No Hire Policy'

First Transit refuses employment to any job applicant who has a past felony conviction or who has been sentenced to any term of incarceration, no matter how brief. The "no-hire" policy is in force regardless of the nature and gravity of the offense, the amount of time passed since the conviction, or whether the offense has any relationship to the job in question.

According to Hudson's complaint, filed today in the U.S. District Court for the Northern District of California, the policy has a "disparate impact" on African-American and Latino job seekers, because they are arrested and convicted at far greater rates than their white counterparts.

"More than 13,000 ATU members at 75 locations in the U.S. and Canada work for First Transit or for another company owned by FirstGroup," said ATU International President Ron Heintzman. "If an African-American or Latino worker applies for a job at one of those properties, we expect them to be treated fairly — to have an equal shot at the job, just like anyone else."

First Transit has contracts to provide bus service in major metropolitan areas including Denver, Phoenix, Portland and Vancouver, as well as dozens of smaller contracts in the U.S. and Canada to provide bus, paratransit, university and airport transportation services.

'Unfair'

One of Hudson's attorneys, Kalman Resnick of the Chicago law firm Hughes Socol, Piers Resnick & Dym, Ltd. added, "When an employer puts in barriers that have nothing to do with the job, that's unfair. And when those barriers affect African-Americans and Latinos more than anyone else, it's more than unfair — it's illegal." Hudson is also represented by NELP attorneys and the Oakland law firm of Goldstein, Demchak, Baller, Borgen &

Dardarian.

Policy guidelines of the U.S. Equal Employment Opportunity Commission (EEOC), cited in the class action complaint filed today, support the claim of discriminatory practices at First Transit. According to the EEOC:

[A]n employer's policy or practice of excluding individuals from employment on the basis of their conviction records has an adverse impact on [African Americans and Latinos]... such a policy or practice is unlawful under Title VII [of the U.S. Civil Rights Act of 1964] in the absence of a justifying business necessity."

'Experienced, Dedicated, Skilled'

In 2009, Ms. Hudson, an experienced and dedicated bus driver skilled at assisting elderly and infirm riders, voluntarily left her employment at a different bus company to join First Transit's Oakland transportation facility as a paratransit driver. Despite her strong work record and experience driving paratransit buses, Hudson was fired after just two days on the job due to a seven-year-old felony welfare fraud conviction, which had been expunged from her record by the state of California.

"This is a person who was convicted many years ago for an offense that is completely unrelated to driving a bus," says ATU International Secretary Treasurer Oscar Owens. "She did everything she was asked to do. She served her sentence, she completed her probation, and her conviction was expunged. Seven years later, she's got a good-paying job, she's supporting her family – and you're going to kick her out on the street and bar her from employment? It doesn't make any sense; we can't let employers get away with that kind of discriminatory behavior."

Ms. Hudson has since found employment at another bus company. "Adrienne has a good work record, and it's very clear that her past issues have nothing whatsoever to do with her ability to be a safe and responsible transit operator," said Owens. "She was harmed by First Transit when they fired her after two days on the job, and the evidence will show that First Transit is also discriminating against other African-Americans and Latino employees and job applicants."

'Equal Opportunity'

"Members of our union believe very strongly in equal opportunity, so we're going to stand together and fight discrimination wherever we find it," said ATU President Heintzman.

The Amalgamated Transit Union (ATU), an affiliate of the AFL-CIO, has more than 190,000 members in 264 local unions in 44 states and nine Canadian provinces. ATU members include bus drivers, light rail operators, maintenance and clerical personnel and other transit and municipal employees. The union's website is www.ATU.org.

The National Employment Law Project (NELP) is a non-profit organization that promotes policies and programs that create good jobs, strengthen upward mobility, enforce hard-won worker rights, and help unemployed workers regain their economic footing through improved benefits and services.

» login to post comments | | printer friendly version